MONONGAHELA POWER COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 80–1706.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1981.

Decided Aug. 24, 1981.

John C. Unkovic, Pittsburgh, Pa. (James P. Hollihan, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on brief), for petitioner.

Jerrold J. Wohlgemuth, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for respondent.

Before BUTZNER and HALL, Circuit Judges, and ERWIN,* District Judge.

ERWIN, District Judge:

Monongahela Power Company (the Company) petitions this court to review an order of the National Labor Relations Board issued on September 30, 1980. The Board has filed a cross-application for enforcement of its order. The Company has refused to bargain with the International Brotherhood of Electrical Workers (the Union) on the grounds that (1) the bargaining unit certified by the Board is improper, because it includes control room foremen (CRF's) who are "supervisors" within the meaning of Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11) (1976); and (2) the election was tainted by a number of misrepresentations and should therefore be set aside. We agree with the Company that CRF's are "supervisors" within the meaning of the Act and deny enforcement of the Board's order on that basis.

On May 21, 1979, the Union filed a petition with the Board seeking a certification election in a unit composed of virtually all of the Company's employees at its Fort Martin plant in Maidsville, West Virginia. The proposed unit included five individuals employed as CRF's. The Company opposed the inclusion of CRF's in the bargaining unit, and a representation hearing was held on June 15, 1979 to resolve the issue. On July 3, 1979, the Regional Director issued his decision finding that CRF's were employees and should be included in the bargaining unit and directing that an election be held. The Company filed for review of the Regional Director's decision on July 13, and the Board denied the request on July 25 on the basis that there were no substantial issues raised which warranted review.

An election was held at the Fort Martin Power Station on August 3, 1979 and was won by the Union by a vote of 58–56 with one challenged ballot. On August 10, 1979, the Company filed timely objections to the conduct of the election, alleging that the Union, through its officers, agents, and representatives, had made material misrepresentations regarding wages, benefits, and other conditions of employment at the Company.[1] The Regional Director conducted an investigation and on November 20, 1979 issued a Supplemental Decision and Certification of Representative completely overruling the objections and certifying the Union as the exclusive bargaining representative. The Company's subsequent request for review was denied by the Board.

On April 24, 1980, the Union filed an unfair labor practice charge against the Company, based on its refusal to bargain. A Complaint and Notice of Hearing was filed by the Board on May 16, 1980. The Board subsequently moved for summary

---

* The Honorable Richard C. Erwin, United States District Judge for the Middle District of North Carolina, sitting by designation.

1. The misrepresentations concerned: (1) overtime pay, shift differential, and paid meal allowance benefits of the Company's employees at facilities represented by the Union; (2) company benefits received by the Company's organized and unorganized employees over the last ten years; (3) the use to which the Union put its membership dues; (4) the rights of employees who choose not to join the Union; (5) the events surrounding the 1979 contract negotiations at one of the Company's organized facilities; (6) the employee relations of other employers; and (7) implications that the Company had engaged in unfair labor practices against Union supporters.

judgment on the ground that the issues raised by the Company in its answer to the complaint had been previously decided in the representation proceeding. The motion was granted, the Board concluding that the Company had refused to bargain with the Union in violation of Section 8(a)(5) and (1) of the Act. The Board then issued the order which is before this court.

The facts on which the Regional Director based his decision concerning the CRF's were adduced at the representation hearing before Hearing Officer Thomas M. Stefanaco. The only witness at the hearing was Raymond S. Hackett, manager of the Fort Martin Power Station, who appeared on behalf of the Company. The following summary of facts is based on that testimony.

Monongahela Power Company is a wholly owned subsidiary of Allegheny Power Systems, Inc. and operates as a public utility engaged in the generation and transmission of electricity at various locations in West Virginia and Ohio. The Fort Martin Power Station produces electricity through the use of coal-fired boilers which run two steam driven generating units. These units generate approximately 1100 megawatts of electric power. The facility is composed of three departments, each of which is headed by a superintendent who reports directly to the plant manager. Approximately 138 people are employed at the plant.

The Operations Department bears the responsibility for actually running the generating units. The department personnel include the superintendent, four shift supervisors, five control room foremen, eight maintenance men, a station lubricator, and fifteen operators classified A, B, and C. Also included are a coal supervisor, a coal foreman, and twenty-one coal operators.

There are four main crews in the Operations Department, and each is scheduled to work an eight-hour shift, five days a week. In addition, there is a fifth crew—the relief crew—which covers one regular eight-hour shift per week and is available as relief for any of the other regular crews. The relief crew works an otherwise normal forty-hour

week doing special assignments under the direction of a shift supervisor. The crews are assigned work shifts such that the plant operates twenty-four hours a day, seven days a week. Every ten days, each crew rotates to a different eight-hour shift—day, afternoon/evening, and night. The plant manager and the operations superintendent normally work the day shift, Monday through Friday, but both are available twenty-four hours a day in case of an emergency.

A typical operations crew consists of a shift supervisor, one CRF, two maintenance men, and three operators, A, B, and C. The CRF, operators, and maintenance men all report directly to the shift supervisor, who in turn reports to the operations superintendent. The CRF's work exclusively in the control room while the operators work on the plant floor, watching the equipment and communicating by telephone or over the public address system with the CRF.

The station is run from the control room which is located in the center of the plant close to the two generating units. The control room contains computer printout terminals, pressure and heat gauges, television monitors, and other information equipment which serve as indicators of the status of the plant's machinery. The CRF is in charge of the control room and is often the only employee there. From the control room, the CRF monitors the operation of the power generating units, the coal handling system, the plant's security system, and the startup and shutdown of machinery. He reports directly to the shift supervisor and does not generally leave the control room unless relieved by another employee.

The plant is almost completely automated, and its daily operation is governed to some extent by written procedures and guidelines. Its machinery can, however, be run manually. The CRF and the operators have access to manufacturers' guidelines for the operation of plant machinery and the Company's guidelines for handling the startup and shutdown procedures and emergency situations. There also exist estab-

lished limitations for steam pressure, heat, and the like, of which the CRF is aware and which are monitored from the control room. The CRF generally follows established procedures whenever the equipment reaches or exceeds its prescribed limit. In situations where no predetermined procedure exists, the CRF uses his own judgment.[2]

During a startup procedure, the CRF coordinates the operators and maintenance men as they perform their tasks. The startup is a complex procedure, and therefore, the plant manager always tries to be in the control room to assist the CRF. The CRF is likewise responsible for coordination of the shutdown procedures.

The monitoring and handling of emergency situations is a crucial job responsibility for the CRF. When an alarm is heard from one of the monitors in the control room, the CRF is expected to react quickly, evaluate the problem, and determine the appropriate response, which is usually one of the established procedures. Sometimes the CRF can alleviate or resolve the problem by operating the affected machinery from the control room. Often he must call an operator who will deal with the problem from the plant floor. The CRF may instruct the operator in what procedure to follow; if he cannot determine the nature of the problem from the control room, the operator must analyze the problem himself and report back to him. An experienced operator may make the necessary corrections before reporting back to the CRF. The CRF and the operators remain in close communication by telephone as the CRF utilizes the control room monitors to ascertain whether a particular problem is being satisfactorily resolved.

Some emergencies require decisive action to avoid total shutdown. In those situations, the shift supervisor and plant manager report to the control room to assist the CRF. Often the emergency requires an instantaneous response, and the CRF must make a decision and take decisive action without waiting for the shift supervisor to arrive. On those occasions, the shift supervisor will then be advised of whatever action was taken by the CRF. CRF's spend twenty to twenty-five percent of their day responding to emergency problems.

All employees at the plant, including CRF's, are salaried. CRF's earn between seven percent less than shift supervisors and fifteen to twenty percent more than the operators. All employees receive the same basic benefits, including vacation, hospitalization, group life, retirement, sick pay, and leave of absence. CRF's are exempt employees, however, as are other management personnel, and receive additional benefits such as travel insurance and jury pay above their normal salary. Because they are required to be in the control room at all times, CRF's are allowed to work on scheduled holidays and use that time to add on to their vacations, a flexibility which is not allowed nonexempt employees. CRF's do not attend the weekly supervisors' meetings; they do, however, attend the annual supervisors' dinner and have attended training conferences which were not open to other employees. CRF's have the authority to talk with employees about minor disciplinary problems. In addition to directing operations employees, CRF's train them as relief CRF's or as new employees. CRF's can have employees stay past their normal shift times.

### Discussion

We are well aware of the demonstrated expertise of the Board in resolving questions of this nature, and that as a general rule, the Board's findings are to be accepted if they are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). We are not barred, however, from setting aside a Board decision when we cannot "conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety

---

**2.** The CRF's were responsible for writing a checklist for shutdowns and startups of equipment.

furnishes, including the body of evidence opposed to the Board's view." 340 U.S. at 488, 71 S.Ct. at 464.

■ The Regional Director found that CRF's are not supervisors within the meaning of Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11) (1976). That section provides that:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

It is well established that this section is to be read in the disjunctive, so that an individual possessing any of the above-enumerated powers is considered a "supervisor" for purposes of the Act. *NLRB v. Pilot Freight Carriers, Inc.*, 558 F.2d 205, 207 (4th Cir. 1976), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978); *NLRB v. Metropolitan Petroleum Co.*, 506 F.2d 616, 618 (1st Cir. 1974); *NLRB v. Brown Specialty Co.*, 436 F.2d 372, 375 (7th Cir. 1971).

In holding that CRF's are not supervisors, the Regional Director concluded that because the participation of the CRF's in decisions concerning hiring, evaluations, promotion, or discharge of employees was only occasional and usually involved the participation of the shift supervisor or station manager, those functions were insufficient to impart supervisory status. With respect to the responsibility of CRF's to give directions to operators or maintenance employees, the Regional Director concluded that these directions are "based upon their greater skills and experience, are dictated by written procedural and operating guide-

lines, and do not involve the exercise of independent judgment." [3]

We agree with the Board's conclusion that CRF's do not exercise the requisite authority with regard to hiring, discharge, transfer, promotion, recall, discipline, or adjustment of grievances of other employees and so are not supervisors within the meaning of the initial part of Section 2(11). CRF's are generally unaware of whose applications are on file. Neither do they significantly affect the transfer of employees. The normal procedure is for the plant manager to solicit opinions from *all* who know about an employee's work before reaching a decision as to transfer. CRF's do not figure prominently in the discharge of employees.

Routine personnel matters are handled by the shift supervisors. This includes the preparation of work assignment schedules, vacations, and timecards, resolving grievances, and preparing employee evaluations. The CRF is involved to a limited extent, generally handling those duties which have been delegated to him by the shift supervisor. Although this task appears in his job description, there is no evidence that the CRF's have resolved employee grievances. Their role in employee discipline also appears to be minor.

■ Mindful that the powers in Section 2(11) are to be read in the disjunctive, we are of the opinion that there exists sufficient evidence in the record to demonstrate that CRF's "responsibly direct" other employees and in doing so utilize the requisite "independent judgment."

That the CRF "directs" other employees is readily apparent from the record and further is exemplified by his job description, which provides generally that he "direct and participate in activities required to achieve safe, economical, and reliable operation of all electrical, mechanical, and steam generating power production equipment." [4]

---

3. Joint Appendix, p. 148.

4. Joint Appendix, p. 140. The other "typical duties" of a CRF include:

a. Direct and participate in the operation of power station boilers, turbines, generators, condensers, switchboards, substations, and related auxiliary equipment during an assigned shift.

The question is whether that direction is "responsible" within the meaning of Section 2(11).

"Responsibility" is defined as being "answerable for the discharge of a duty or obligation. Responsibility includes judgment, skill, ability, capacity, and is implied by power." *Ohio Power Company v. NLRB*, 176 F.2d 385, 387 (6th Cir. 1949), *cert. denied*, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949). The CRF is in charge of the control room and therefore the entire operation of the plant. It is his expertise and judgment on which other employees, including his superiors, rely. This is illustrated by the evidence adduced at the representation hearing.

Plant Manager Hackett stated at the representation hearing that CRF's are considered by him to be supervisors, and they have been told that they are supervisors. They are considered to be the immediate supervisors of Operators A, B, and C on a particular shift. Mr. Hackett testified that the CRF's have "constant interaction" with these individuals.[5] CRF's do not normally direct the activities of the maintenance men but have the authority to put them to work when and where needed.[6]

There is no dispute that the CRF is responsible for coordinating the activities of the operators and maintenance men during startup and shutdown. In emergency situations, he is to analyze and resolve difficulties which arise from the operation of the machinery. After doing so, he often tells operators what procedures they should then follow in dealing with those difficulties. The CRF can determine whether a problem has been satisfactorily resolved by observing the monitors. Emergencies may arise which allow no time to wait until a shift superintendent arrives; the CRF moves first and advises his superiors later. We think this illustrates that the CRF "responsibly directs" other employees.

In arriving at this conclusion, we find a recent decision to be particularly persuasive. In *Maine Yankee Atomic Power Co. v. NLRB*, 624 F.2d 347 (1st Cir. 1980), the court analyzed the supervisory status of "shift operating supervisors" (SOS's), who were in charge of the control room of a nuclear power plant. The functions, duties, and responsibilities of the SOS in *Maine Yankee* are quite similar to those of the CRF in this case.

In holding that the SOS is not a supervisor within the meaning of Section 2(11), the Board in *Maine Yankee* discounted the significance of the SOS's authority to direct other shift employees in much the same way as the Regional Director in the instant case discounted the Fort Martin CRF's functions of directing plant operators in the

b. Direct and participate in placing equipment in service, removing equipment from service, releasing equipment for maintenance, and switching any electrical equipment at the station.

c. Direct and participate in the testing of equipment.

d. Direct and participate in the preparation of records of all operations and changes to the equipment during the shift and prepare or check all station daily operating reports.

e. Contact power control centers regarding station capacity, system conditions, planned and forced outages, load changes, switching and voltage schedule unusual or emergency conditions, and other operating requirements and problems.

f. Keep informed of company labor policies and endeavor to settle minor complaints and misunderstandings.

g. Plan and schedule delegated phases of operating work at the station, and develop work schedules for the assignment of operators needed to man the equipment according to capacity requested by power control personnel and the cleaning, oiling, and inspecting of station equipment to conform with load conditions.

h. Report unusual or emergency operating conditions which affect plant capacity and reliability.

i. Perform special studies and investigations.

j. Contact system power supply personnel to obtain and exchange information and to discuss and work out problems in regard to operating, engineering, safety, and related activities affecting equipment operation.

k. Assist shift supervisor in performance evaluation of operating personnel on an assigned shift.

5. Joint Appendix, pp. 33-34.

6. *Id.*, p. 30.

startup and shutdown of equipment or in emergency situations. The Board ruled that the SOS did not possess supervisory authority, because the occasions on which directions were given to other employees were of a " 'routine and repetitious nature,' involving little use of independent judgment," as evidenced by the existence of pre-established operating procedures which were followed on most occasions. 624 F.2d at 362.

The court rejected the Board's contention that the exercise of authority by the SOS was of a routine and repetitive nature. It found that an employee such as the SOS, who must coordinate the activities of several other employees to ensure the smooth operation of delicate machinery, necessarily exercises a significant degree of independent judgment. We find that reasoning applicable here. As the duties of the SOS and the CRF are so similar, we find the following language to be particularly persuasive:

> The SOS's duties include ensuring that numerous gauges are accurately monitored, responding efficiently and appropriately to the many warning signals and alarms should they become activated, and seeing that any one or more of the plant's some 60–70 systems are properly placed in and out of service on the many occasions when that is necessary. These tasks at times involve his coordinating the efforts of the three other operators and making decisions among them as to the correct action to take whenever there is any question. And, while the Maine Yankee facility is semi-automated and there

are many safety back-ups, the possibility of operator error is not merely theoretical . . . such error could cause damage to the plant . . . . We are at a loss to see how such grave responsibility can be swept aside as routine and clerical.

624 F.2d at 361.

In addition, the court in *Maine Yankee* found the role of the SOS during an emergency to be further evidence of his supervisory status. In emergencies, the SOS, like the CRF in this case, was responsible for taking the necessary action when consultation with his shift superintendent was impossible. That the SOS would be expected to inform his superior of an emergency would not strip him of his authority and duty to act. 624 F.2d at 364. The same is true of this case. The CRF can and often does act on his own authority if an emergency situation requires it.[7]

In analogizing the duties of the CRF to those of the SOS in *Maine Yankee*, we are well aware that the records in these two cases are not identical. The *Maine Yankee* record was developed from the testimony of several witnesses, some of whom worked in the disputed category. In addition, the job description for the SOS was much more explicit than the one we have here. Neither do we make any attempt to equate the seriousness of an error at Fort Martin Power Station with an error at a nuclear power plant. This does not, however, lessen the importance of the CRF at the Fort Martin plant. Given the responsibility placed on him, he must be a skilled employee. However, we do not find from the record before us that he is merely an automaton who does

---

7. Plant Manager Hackett testified to the following:

Q. What kind of emergencies arise at the plant?
A. Well, we lose pieces of equipment.
Q. What do you mean, "lose"? They don't work?
A. That's right. We got the worst mills in the world, they're ball-type mills. You break a ball and the mill has to be taken out of service right now. It quits performing and if you are not able to deliver fuel to the boiler you have to get the load down, get that mill out of service. The controlling foreman has to do all this. There is no

time to wait for someone to come help him. Usually he gets help after it's all over.
Q. If he doesn't do it, what happens?
A. Well, you could lose the whole unit. If you don't get the thing back to the level that you can handle it with the equipment still in service, then the whole works goes right down the tubes.
Q. So, circumstances dictate that he take decisive action or else the whole plant will not function at all?
A. He has to make a judgment, make it quick and do something. That's correct.

Joint Appendix, pp. 65–66.

little than "supervise the use of sophisticated machines." *Arizona Public Service Co. v. NLRB*, 453 F.2d 228, 231 (9th Cir. 1971). He is a supervisor, with responsibility for himself and others, and was therefore improperly included in the bargaining unit as an employee.

Our decision that CRF's are supervisors within the meaning of Section 2(11) means that the bargaining unit delineated by the Union was improper, and the election should be set aside. For that reason, we need not reach the Company's contentions regarding election misrepresentations. If required to consider the Company's arguments on the record before us, we would hold them to be without merit and affirm the Board.

*Accordingly, the Company's petition for review is granted and the Board's application for enforcement of its order is denied.*