UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 96-2267
(5-CA-22170)

_____

National Labor Relations Board,

                                        Petitioner,

        versus

D & D Enterprises, etc.,

                                        Respondent.


_____

O R D E R

_____


        The Court amends its opinion filed September 4, 1997, as
follows:

        On page 5, first full paragraph, line 6 -- the phrase "to Wil-
liams and Johnson" is corrected to read "to <u>Johnson</u> and <u>Williams</u>."

        On page 10, first full paragraph, lines 3-4 -- the sentence is
corrected to end "<u>Johnson</u> on September 9, 1991, and <u>Williams</u> on
September 16, 1991."

                                For the Court - By Direction


                                /s/ Patricia S. Connor
                                _____
                                        Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

D & D ENTERPRISES, INCORPORATED,
d/b/a Beltway Transportation
Company,
Respondent.

No. 96-2267

On Application for Enforcement of an
Order of the National Labor Relations Board.
(5-CA-22170)

Argued: June 2, 1997

Decided: September 4, 1997

Before RUSSELL and HAMILTON, Circuit Judges, and
HOWARD, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Petition for enforcement granted in part, vacated in part, and
remanded by published opinion. Judge Hamilton wrote the opinion,
in which Judge Russell and Judge Howard joined.

_____

**COUNSEL**

**ARGUED:** Steven B. Goldstein, NATIONAL LABOR RELATIONS
BOARD, Washington, D.C., for Petitioner. Steven Charles Kahn,
MILLER, CANFIELD, PADDOCK & STONE, P.L.C., Washington,

D.C., for Respondent. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Margaret Gaines Neigus, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.

---

## OPINION

HAMILTON, Circuit Judge:

The National Labor Relations Board (Board) petitions for enforcement of its order entered against D&D Enterprises, Inc. d/b/a Beltway Transportation Co. (Beltway). In its order, the Board found that Beltway: (1) violated 29 U.S.C. § 158(a)(1), (3) of the National Labor Relations Act (NLRA) by failing to reinstate economic strikers Jimmy Williams, David Johnson, and Thaddeus Randall to their prestrike positions and, later, by terminating them; and (2) violated 29 U.S.C. § 158(a)(1), (5) by failing to recognize and refusing to bargain with the Drivers, Chauffeurs & Helpers Local Union No. 639 a/w International Brotherhood of Teamsters, AFL-CIO (Union). We grant the petition for enforcement in part, vacate it in part, and remand for further proceedings.

I.

Beltway is located in Forestville, Maryland and provides bus transportation services on regularly scheduled routes for various public and private entities in the Washington, D.C. metropolitan area. Beltway employs two general varieties of drivers: (1) "regular run drivers," who are assigned to routes on a permanent basis, and (2) "utility drivers," who fill in for regular run drivers when the regular run drivers are absent and, in addition, pick up any additional runs Beltway might have on any given day. Regular run drivers are required to call in to Beltway's dispatch office between 6:00 and 6:30 a.m. when they are going to be absent on any given day. The runs that become available because of such an absence by a regular run driver are then assigned to the utility drivers on a first come, first served basis.[1]

---

[1] Notably, both regular run and utility drivers had to report to work by 6:30 a.m.

In the summer of 1990, Beltway employee Johnson contacted the Union. Thereafter, the Union began a campaign to organize Beltway's employees. Johnson solicited his fellow employees to sign union authorization cards, and he served as the Union's election observer on October 5, 1990, when the National Labor Relations Board (NLRB) conducted an election to determine whether a majority of Beltway's eligible employees favored unionization.**2** The Union won the election, and on October 24, 1990, the Union was certified as the exclusive collective bargaining representative of Beltway's drivers and maintenance employees.

Union officials held approximately twelve bargaining sessions with Beltway management personnel between November 1990 and August 1991. Johnson and Williams, two of Beltway's drivers, served on the Union's bargaining committee and attended all of the negotiating sessions. However, on August 8, 1991, no agreement had yet been reached, and fifteen of Beltway's thirty-four employees began an economic strike, protesting Beltway's failure to pay its drivers according to the size of the vehicles they drove. The strikers included regular run drivers Williams, Johnson, and Randall.

The strike progressed for the rest of that day and into the following day. However, shortly after noon on Friday, August 9, 1991, Union Business Representative James Woodward telephoned Neal Wenger, Beltway's Vice President of Operations, and told him that the strike was over and the striking drivers would unconditionally return to work the following Monday. Further, Woodward told Wenger that the "wash crew," which cleaned Beltway's buses over the weekend and included Williams and Johnson, would be available to work that weekend. Beltway officials informed the Union that the wash crew's services would not be needed that weekend but did not mention any change in status or position of any striking employee.

Despite the fact that Beltway knew the strike was already over, on Saturday, August 10, Wenger offered Williams, Johnson, and Randall's runs to drivers Kenneth Hall, Danny Jenkins, and Jessie Ben-

---------------------------------------------------------------

**2** The eligible employees included all drivers, maintenance personnel, and fleet maintenance chiefs employed by Beltway, but excluded all office clerical staff, professional managers, guards, and supervisors.

3

ton. Hall requested that he not be placed on any route that had been Williams, Johnson, or Randall's immediately prior to the strike. However, Wenger told Hall that, beginning on Monday, August 12, he wanted Hall to drive the IRS Wilson Boulevard route, Johnson's route before the strike. Hall protested further about driving Johnson's route, but Wenger and Beltway's President, Jay Davis, assigned the route to Hall despite his protestations. On that same day, Beltway gave the routes Williams and Randall had been driving immediately prior to the strike to Danny Jenkins and Jessie Benton, respectively.

On Monday, August 12, 1991, the day Williams, Johnson, and Randall returned to work, Hall, Jenkins, and Benton drove their new routes for the first time. When Williams, Johnson, and Randall reported to work expecting to resume driving the regular runs they held immediately prior to the strike, they were told by Beltway officials that they had been "replaced" because of their participation in the strike, but that they could remain employed as utility drivers. By letter dated August 12, Beltway informed its employees that some of the former strikers would not return to their pre-strike positions and had been re-assigned because they had been permanently replaced by other employees.

The former strikers complained to the Union, and on August 12, Union Business Representative Woodward telephoned Wenger requesting that the former strikers be reinstated to their pre-strike positions. Woodward also requested that Beltway resume collective bargaining negotiations. Wenger referred the matter to Herbert Larrabee, Beltway's outside representative. By letter dated August 13, 1991, Larrabee informed the Union that it had been necessary to permanently re-assign utility drivers to the jobs formerly held by Williams, Johnson, and Randall. The letter further stated that while Williams, Johnson, and Randall continued to remain company employees, their job classification had been changed to utility driver.

Following the strike, Randall worked as a utility driver until early September when he was assigned a regular route to drive. However, Williams and Johnson only worked irregularly throughout the month of August. Williams and Johnson were sent home on the days that Beltway officials told them that there were no runs available for them to drive. Then, in early September, Williams and Johnson began driv-

4

ing trucks for another company, Otis Eastern Service (Otis Eastern). In explaining their absences to Beltway, Williams told Wenger that he was temporarily unable to work because of an arthritic condition and Johnson asked for a leave of absence for "personal reasons." Neither mentioned anything about driving for Otis Eastern. When Williams ceased calling in, Wenger called Williams' residence and was informed that he was at work.

With that in mind, Jim Deiso, Beltway's secretary/treasurer, and Davis drove to Williams' residence to investigate his work status and his claims of arthritis. When Williams left his residence, Davis and Deiso followed him as he drove to Johnson's residence and then went on to the Otis Eastern facility. On September 9 and 16, respectively, Beltway sent letters of termination to Johnson and Williams stating that they were being discharged due to abandonment of work.

On August 26, the Union and Beltway held a negotiating session but were unable to come up with an acceptable collective bargaining agreement. The Union and Beltway have not held a negotiating session since then.

In late November 1991, a decertification petition was circulated among Beltway's unionized employees. By signing the petition a Beltway unionized employee expressed the desire not to be represented by the Union any longer. The decertification petition was signed by seventeen eligible Beltway employees, a majority of the bargaining unit's members at the time.

By letter dated March 27, 1992, the Union requested that Beltway resume negotiating sessions as soon as possible. Relying on the November 1991 decertification petition, Beltway responded on April 1, 1992 that it was withdrawing its recognition of, and refusing to bargain with, the Union. Beltway's evidence that the Union no longer represented a majority of the employees in the original bargaining unit consisted of the November 1991 decertification petition. Although three of the decertification petition signatories had left Beltway between November 27, 1991 and April 1, 1992, fourteen valid signatories remained--exactly fifty percent of Beltway's twenty-eight union-eligible employees.

5

Because the Union believed that Beltway engaged in unfair labor practices and violated 29 U.S.C. § 158(a)(1), (3) when it failed to reinstate Williams, Johnson, and Randall to their pre-strike positions as regular run drivers and because the Union believed that Beltway's un-remedied unfair labor practices invalidated the decertification petition under 29 U.S.C. § 158(a)(1), (5), the Union filed complaints against Beltway on August 23, 1991, and April 7, 1992.

On October 26, 1992, a hearing was held before an ALJ. At the hearing, the parties presented conflicting testimony regarding the reason why Williams and Johnson only worked irregularly throughout the month of August following the strike. Beltway claimed that the two often arrived at work late and, therefore, did not receive runs to drive because all the available runs had been assigned to other drivers on a first come, first served basis. As support, Beltway produced the attendance records for Williams and Johnson showing that they arrived at work after 6:30 a.m. on the days they did not receive runs to drive. Beltway also presented evidence which indicated that when Williams showed up for work on time, he received an average of $88 a day for the runs he drove, approximately the same wages he was receiving in his pre-strike regular run driver position. Similarly, Beltway's evidence was that when Johnson arrived at work on time, he received, just like Williams, an average of $88 a day for the runs he drove, approximately the same wages he was receiving in his pre-strike regular run driver position.

Williams and Johnson themselves testified at the hearing before the ALJ and gave a very different version of the story. Williams stated that he arrived at work on time throughout the month of August but nevertheless did not receive work. Johnson testified that he made daily early morning trips every weekday to Beltway from August 12 to August 27, and that, except on four days during that period, was sent home without work even though runs were sometimes given to drivers who had arrived after he did. In sum, the two testified that they were essentially forced to take temporary jobs at Otis Eastern because they could not earn a "livable wage" while working as utility drivers for Beltway. The ALJ never resolved this conflict because he determined that the cause of Williams and Johnson's abandonment of work was irrelevant.

6

Thirteen of the fourteen decertification petition signers also testified during the hearing before the ALJ. They stated that their signatures on the decertification petition accurately reflected their desire to rid the company of the Union and that they still did not want to be part of a union shop. Specifically, the general consensus among the employees was that the company was too small to have a union and that they did not want to give their money to a union when it would not do anything for them anyway. All thirteen testified further that any adverse action taken towards Williams, Johnson, and Randall had nothing to do with their decisions to sign the decertification petition.

On June 9, 1993, the ALJ issued his decision, concluding that Beltway engaged in unfair labor practices, violating 29 U.S.C. § 158(a)(1), (3), when it failed to reinstate Williams, Johnson, and Randall to their pre-strike positions as regular run drivers even though those positions remained open on the afternoon of August 9, 1991, when Beltway officials were informed that the strike had ended. In addition, the ALJ concluded that, although Williams and Johnson lied during the hearing regarding the reasons for their absences from work in September 1991, their abandonment of work at Beltway in September 1991 was irrelevant because no employee misconduct could supersede the employer's obligation to reinstate a striking employee to his still available pre-strike position once the strike ended. Further, the ALJ concluded that Beltway's termination of Williams and Johnson was caused by its failure to properly reinstate the two following the strike. Finally, the ALJ rejected the testimony of the thirteen decertification petition signers and concluded that the decertification petition was invalid because it was tainted by Beltway's unfair labor practices vis a vis Williams, Johnson, and Randall. Because the ALJ declared the decertification petition invalid, the ALJ ruled that Beltway violated 29 U.S.C. § 158(a)(1), (5) by refusing to recognize and bargain with the Union.

Accordingly, the ALJ ordered that Williams, Johnson, and Randall be reinstated to the same runs they were driving for Beltway prior to the strike, and that they be awarded back pay from August 12, 1991 to the present. The ALJ also ordered that Beltway recognize and resume negotiating sessions with the Union.

Beltway appealed the ALJ's decision to the Board, noting several exceptions to the ALJ's findings of fact and conclusions of law. Belt-

7

way also contested the ALJ's award of reinstatement and back pay as well as the ALJ's order that Beltway recognize and negotiate with the Union. Specifically, Beltway argued that it had fulfilled its obligations to Williams, Johnson, and Randall by reinstating them to utility driver positions which were "substantially equivalent" to the regular run driver positions they held prior to the strike and that Beltway could not be forced to reinstate Williams and Johnson because the two had abandoned their jobs and were lawfully terminated. Finally, Beltway objected to the ALJ's conclusion that the decertification petition was tainted and, therefore, could not constitute objective evidence that the Union lacked the majority support of the eligible employees at Beltway.

The Board agreed with the ALJ in all respects as stated in its decision and order of October 31, 1995. Specifically, the Board concluded that: (1) Beltway unjustly terminated Williams and Johnson because Beltway had never properly reinstated them to their pre-strike positions, regardless of any misconduct the two may have engaged in from August 12, 1991 until their respective terminations in September;[3] (2) even if Williams and Johnson's misconduct was relevant, their misconduct was caused by Beltway's unfair labor practices because Williams and Johnson could not earn a livable wage as utility drivers; and (3) the decertification petition was tainted per se due to Beltway's unjust failure to reinstate Williams, Johnson, and Randall and unjust termination of Williams and Johnson.[4] The Board now petitions for enforcement of its order.

---

[3] The Board agreed with the ALJ and concluded that, as a matter of law, it was irrelevant whether Williams and Johnson were consistently tardy during the month of August following the strike. Accordingly, the Board, like the ALJ, never resolved the credibility dispute between Williams and Johnson, and Beltway.

[4] Board Member Cohen dissented in part. Cohen agreed with the other Board members in all respects except that he would have limited back pay for Williams and Johnson to the date they lied during the hearing about the reasons for their absences from work at Beltway in September 1991, and he would not have ordered Beltway to reinstate them.

8

II.

Initially, Beltway challenges the Board's determination that it violated 29 U.S.C. § 158(a)(1), (3) by failing to reinstate Williams, Johnson, and Randall to their pre-strike positions once the strike ended. Beltway contends it did not violate 29 U.S.C. § 158(a)(1), (3) because Williams, Johnson, and Randall were reinstated to "substantially equivalent" positions once the strike ended. This argument has no merit.

Absent a "legitimate and substantial business justification" an employer must reinstate an employee to his pre-strike position if that pre-strike position remains available once the strike ends. See NLRB v. W.C. McQuaide, Inc., 552 F.2d 519, 528 (3d Cir. 1977) ("An economic striker . . . who unconditionally requests reinstatement is entitled to his former position unless the employer has `legitimate and substantial business justifications' for refusing."); see also NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 378 (1967) ("If, after the conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their rights to organize and strike . . . ."); NLRB v. Great Dane Trailers, 388 U.S. 26, 34 (1967) (economic striker who unconditionally requests reinstatement is generally entitled to pre-strike position); Newport News Shipbuilding & Dry Dock v. NLRB, 738 F.2d 1404, 1408 (4th Cir. 1984) (employer who refuses to reinstate strikers who have engaged in a protected strike violates the NLRA unless it can show "substantial business justification" for action); 29 U.S.C. § 158(a)(1), (3). However, an employer is permitted to reinstate an employee to a "substantially equivalent" position when the employer has permanently replaced the employee during the strike. See Great Dane Trailers, 388 U.S. at 34. The prescribed remedy for violating 29 U.S.C. § 158(a)(1), (3) is reinstatement and back pay.

In this case, the Board correctly concluded that Beltway violated 29 U.S.C. § 158(a)(1), (3) when it failed to reinstate Williams, Johnson, and Randall to their pre-strike positions, because their positions were available when the strike ended. Because Randall "bid" on and was assigned to a regular run position on September 9, 1991, he is only entitled to back pay from August 12, 1991, the first work day following the strike, to September 9, 1991. However, because Randall

9

was not reinstated to the run he was driving before the strike, which remained open after the strike, he is entitled to reinstatement to that same regular run driver position. See Fleetwood Trailer, 389 U.S. at 378.

Williams and Johnson were never reinstated to regular run positions by Beltway. Instead, they were placed in utility driver positions and terminated by Beltway in September 1991--Johnson on September 9, 1991, and Williams on September 16, 1991. Accordingly, Williams and Johnson are entitled to back pay at least from August 12, 1991 until the dates of their respective terminations. See 29 U.S.C. § 158(a)(1), (3). They may also be entitled to back pay beyond that date, as well as reinstatement, if Beltway's unjust failure to properly reinstate them caused them to engage in the misconduct-- abandonment of work--for which they were terminated. See NLRB v. Rockwood & Co., 834 F.2d 837, 841 (9th Cir. 1987).

III.

That brings us to the next question--did the Board correctly conclude that Williams and Johnson are entitled to reinstatement? The Board concluded that even though Williams and Johnson had allegedly been terminated for a legitimate cause--abandonment of work-- they were still entitled to reinstatement to their pre-strike regular run driver positions. The Board premised its decision on two alternative grounds. First, the Board concluded that Williams and Johnson were entitled to reinstatement regardless of any misconduct on their parts because Beltway never properly reinstated them to their pre-strike positions. Second, in the alternative, the Board concluded that Williams and Johnson's terminations were caused by their placement in utility driver positions following the strike. In this regard, the Board reasoned that because there was no guarantee of earning a "livable wage" as a utility driver for Beltway, Williams and Johnson's abandonment of their jobs to drive for Otis Eastern was essentially caused by their placement in utility driver positions following the strike.

A.

The Board first asserts that no matter what misconduct Williams and Johnson engaged in leading to their terminations, Beltway is

10

required to reinstate them because reinstatement is the remedy pre-scribed by 29 U.S.C. § 158(a)(1), (3). Put another way, the Board contends that employee misconduct can never supersede the employ-er's obligation to reinstate a striking employee to his still available pre-strike position once the strike ends. We conclude that the Board's contention, which creates a per se rule, is contrary to the Board's own precedent and our Circuit precedent.

In NLRB v. Wright Line, a Div. of Wright Line, Inc., 251 NLRB 1083 (1980), enforced 662 F.2d 899 (1st Cir. 1981), the Board first articulated, and the First Circuit enforced, the following standard: an employer may properly discharge an employee when that discharge is unrelated to the employee's union affiliation or union activity. See 662 F.2d at 901. In Wright Line, the Board held that in order to estab-lish that an employee was unjustly discharged, General Counsel must establish that protected conduct was a motivating factor in the employer's decision to discharge the employee. See id. at 901-02. Only after General Counsel has met that burden does the employer have to demonstrate that it would have taken the same action, even in the absence of the protected conduct. See id. at 902.

Our own precedent follows similar reasoning. In Standard Prods. Co., Rocky Mount Div. v. NLRB, 824 F.2d 291 (4th Cir. 1987), a case involving the alleged improper termination of an employee for union organizing activity, we remanded the matter for the Board's consider-ation of whether the employee's protected activity had anything to do with his discharge. See id. at 296. The Standard Prods. case is repre-sentative of a long line of Fourth Circuit precedent which requires that the Board engage in a burden-shifting analysis similar to that uti-lized in the Title VII context to determine whether the employer's unfair labor practices were causally related to the employee's termi-nation or whether the employee would have been terminated even absent the union activity. See, e.g., id.; McLean Trucking Co. v. NLRB, 719 F.2d 1226, 1227 (4th Cir. 1983) (enforcement denied because Board did not articulate affirmative and persuasive reason for determining that employee would not have been discharged "but for" illegitimate reason).

In this case, under Wright Line and Standard Prods., General Counsel was required to demonstrate that Williams and Johnson's ter-

11

mination was somehow causally related to Beltway's unjust failure to properly reinstate them to their pre-strike positions before the Board could order reinstatement. Accordingly, if Beltway's dismissal of Williams and Johnson was for tardiness and abandonment of work and Williams and Johnson's tardiness and abandonment of work were not causally related to Beltway's unfair labor practices, pursuant to the Board's own Wright Line standard and our circuit precedent, the Union never established its prima facie case, and Beltway is not required to reinstate Williams and Johnson. See Earle Indus., Inc. v. NLRB, 75 F.3d 400, 405 (8th Cir. 1996) (Board cannot properly order reinstatement when employee misconduct which resulted in termination is unrelated to protected activity).

Our decision is not inconsistent with David R. Webb Co., Inc. v. NLRB, 888 F.2d 501 (7th Cir. 1989), a case heavily relied upon by the Board. In David R. Webb, the employer permanently filled several positions during an economic strike and, thus, the striking employees were validly placed on a preferential recall list. See id. at 502. When three complaining former employees reached the top of the list, they were placed into a lower level position than the pre-strike position any of the three had held. In addition, it was a position that none of the three had ever performed before, and a position for which none of them had ever been trained. See id. Not surprisingly, the three performed poorly in their new jobs, and they were discharged for that poor performance. See id. Moreover, they were not placed back on the recall list. See id. The Board concluded that all three were essentially "set up" for failure and were, therefore, entitled to be placed back on the recall list (i.e., reinstated) because their employer had never discharged its obligation to properly reinstate them following the strike. See id. at 508, 510. The Seventh Circuit agreed and held that the company was required to reinstate the three employees to their pre-strike jobs or to "substantially equivalent" positions. See id. at 510.

The Board reads David R. Webb as requiring reinstatement in this case even though Williams and Johnson's tardiness and abandonment of work may have been unrelated to Beltway's unfair labor practices. At least one court agrees with the Board's interpretation of David R. Webb. See NLRB v. Ryder Sys., Inc., 983 F.2d 705 (6th Cir. 1993) (holding that employee was entitled to reinstatement even though the employee was terminated for conduct unrelated to his union activities

12

(gross insubordination) because employee was wrongfully reinstated without his seniority following his participation in a sympathy strike). We find the Board and the Sixth Circuit's reading of David R. Webb unpersuasive. First, the David R. Webb court was not confronted with the question presented here--whether an employee can be discharged when the cause of his termination is unrelated to the company's unfair labor practices. The court in David R. Webb recognized as much. See 888 F.2d at 510 ("The NLRB's order in this case, however, directs reinstatement to the employees' pre-strike positions or positions of substantial equivalent of those positions, and these are positions for which the employees' inability to perform in the lower-level positions is not related."). Second, accepting the Board's view would run afoul of our decision in Standard Prods. which requires a showing that the termination was caused by the company's unfair labor practices. Third, our position is consistent with the balance between the rights of employees and employers that Congress attempted to achieve in enacting the NLRA. Section 158(a) provides that an employee shall not be discriminated against for engaging in union activities. On the other hand, § 160(c) provides that an employer cannot be required to reinstate an employee who has been properly terminated for cause. The Board's proposed rule, which would require the reinstatement of an employee who engaged in misconduct unrelated to the employer's unfair labor practices, eviscerates the employer's rights as recognized in § 160(c). Our rule, however, preserves the balance contained in the NLRA by requiring that the Board demonstrate some causal nexus between the employer's unfair labor practices and the reason for the employee's termination before the Board can order the employee's reinstatement.

B.

We now turn to the question of whether there was a causal connection between Beltway's unfair labor practices and Williams and Johnson's abandonment of work. According to the Board, Williams and Johnson's abandonment of work was caused by Beltway's failure to reinstate Williams and Johnson as regular run drivers following the strike. More specifically, the Board argues that Williams and Johnson's abandonment of work was caused by their inability to earn a "livable wage" as utility run drivers.

13

In considering the Board's argument that Beltway's misconduct caused Williams and Johnson to abandon work, we note, first, that arriving at work by 6:30 a.m. is a requirement for all Beltway drivers --both regular run drivers and utility drivers. The only difference between the two positions is that regular run drivers are guaranteed runs if they arrive at work on time, while utility drivers receive runs on a first come, first served basis. We note, second, that Beltway's evidence shows that Williams and Johnson received runs every day they arrived at work on time following the strike. According to Beltway, all Williams and Johnson had to do in order to earn a livable wage as a utility driver was to comply with a requirement of all drivers by arriving at work on time. Thus, if Beltway's evidence is credited, their failure to earn a livable wage was attributable to their failure to arrive at work on time, not to their status as utility drivers and, consequently, not to Beltway's misconduct in reinstating them into utility driver positions.[5] As noted earlier, however, Williams and Johnson assert that they did arrive at work on time and that they simply were not given sufficient runs to enable them to earn a livable wage.

Because arriving at work on time is a requirement for all Beltway drivers, Beltway can only be said to have caused Williams and Johnson's abandonment of work if Williams and Johnson arrived at work on time and were still unable to earn a livable wage. Both the ALJ and the Board, however, declined to resolve the parties' factual dispute concerning whether Williams and Johnson arrived at work on time yet were unable to earn a livable wage or, alternatively, whether their failure to earn a livable wage was the direct result of their failure to arrive at work on time. Because resolution of the causation issue turns on resolution of this factual dispute, we remand this issue for further proceedings consistent with this opinion.

IV.

Finally, we must address the question of whether Beltway's unfair labor practices "tainted" the decertification petition to such a degree that the petition cannot be relied upon to show the Union lacks the

_____

[5] Beltway's evidence also shows that Williams and Johnson had been reprimanded for arriving at work late as regular run drivers.

14

support of a majority of Beltway's eligible employees. A union's majority status is irrebuttably presumed to continue for a one-year period following certification. See NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 777-78 (1990). Thereafter, the presumption of majority status becomes rebuttable with the burden of proving lack of majority support on the employer. See id. at 787. Here, the Union was certified on October 5, 1990 and the decertification petition did not begin circulating amongst Beltway's unionized employees until November 25, 1991. Accordingly, the one year period of irrebuttable majority support had passed when the decertification petition was circulated.

Once the period of rebuttability begins, the employer must show that there is a good faith doubt regarding majority support founded on a sufficient objective basis in order to meet its burden. See Terrell Mach. Co. v. NLRB, 427 F.2d 1088, 1090 (4th Cir. 1970). Unless the employer establishes such a good faith doubt, an employer violates 29 U.S.C. § 158(a)(1), (5) by withdrawing recognition from and refusing to bargain with a certified union. See id. at 1090-91.

A petition signed by at least half of a bargaining unit's members in which they indicate that they do not wish to be represented by the union ordinarily constitutes sufficient objective evidence to rebut the union's presumed majority status. See NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1183 n.56 (D.C. Cir. 1981); see also AMBAC Int'l, Ltd., 299 NLRB 505, 1990 WL 132816, at *3 (1990) (evidence that exactly half of bargaining unit's employees no longer support union sufficient to discharge employer's burden that union no longer enjoys majority support). If, however, General Counsel presents evidence which establishes that the union's decline in support is attributable to the employer's misconduct, the employer's "good faith" defense to the withdrawal of recognition fails. See Sullivan Indus. v. NLRB, 957 F.2d 890, 897-98 (D.C. Cir. 1992). When General Counsel attempts to rebut an employer's good faith belief of lack of majority union support, a multi-factored analysis must be undertaken to determine the validity of the employer's belief. See Master Slack Corp., 271 NLRB 78, 1984 WL 36573 (1984); Olson Bodies, Inc., 206 NLRB 779 (1973). These factors include: (1) the length of time between the unfair labor practice and the decertification petition; (2) the nature of the employer's illegal acts; (3) any possible tendency to cause

15

employee disaffection from the union; and (4) the effect of the unlaw-ful conduct on employee morale, organizational activities, and membership in the union. See Master Slack, 1984 WL 36573, at *10.

In this case, Beltway presented evidence of support for decertification in the form of a decertification petition signed by exactly half of the unionized employees. The Board rejected the decertification petition, however, stating that the ALJ found that Beltway's misconduct was aimed at undermining employee support for the Union and, thus, no reliance could be placed on the decertification petition. The Board reached this conclusion notwithstanding the fact that many of Beltway's eligible employees professed ignorance of their employer's misconduct, see Hearst Corp., San Antonio Light Div., 281 NLRB 764, 765 (1986), aff'd, 837 F.2d 1088 (5th Cir. 1988); see also Hancock Fabrics, d/b/a Fabric Warehouse, 294 NLRB 189 (1989), aff'd, 902 F.2d 28 (4th Cir. 1990), and without applying the multi-factored analysis required by Board precedent when determining whether the employer's good faith belief that the union lacks majority support is valid. Particularly in light of the absence of any evidence suggesting a connection between employee disaffection from the Union and Beltway's misconduct with regard to Williams, Johnson, and Randall and in light of the testimony suggesting that many of the petition's signatories were unaware of Beltway's misconduct, at a minimum, the Board should have applied its own multi-factored analysis in assessing the validity of Beltway's good-faith defense to its withdrawal of recognition of the Union, rather than dismissing Beltway's defense out of hand. Because the Board failed to properly assess the validity of Beltway's defense, a remand is necessary.

In addition, we must remand for reconsideration of this question because resolution of this issue depends, in part, on the Board's resolution of the evidentiary dispute concerning the reason Williams and Johnson were unable to secure work as utility drivers following the strike. Simply put, if after resolving the evidentiary dispute between Beltway and Williams and Johnson, the Board orders that Williams and Johnson must be reinstated, the numerical calculus will change. There will be thirty Beltway employees eligible for the bargaining

16

unit and only fourteen signatures on the decertification petition. Accordingly, the Union will still enjoy majority support.**6**

V.

For the reasons stated herein, we grant that portion of the petition for enforcement which: (1) determines that Beltway violated 29 U.S.C. § 158(a)(1), (3) when it replaced Williams, Johnson, and Randall as regular run drivers after the strike and gave them utility driver positions; (2) ordered Beltway to pay Randall back pay from August 12, 1991 until the date of his reinstatement to a regular run driver position and to reinstate Randall to the regular run he held immediately prior to the August 1991 strike; and (3) ordered Beltway to award Williams and Johnson back pay from August 12, 1991 until the date of their respective terminations. We vacate that portion of the Board's order which: (1) ordered the reinstatement of Williams and Johnson; and (2) ordered Beltway to recognize and bargain with the Union due to the invalidity of the decertification petition. We also remand the matter so the Board can resolve the evidentiary dispute

_____

**6** Notably, if the Board determines on remand that Williams and Johnson should be reinstated, the very fact of their unjust termination might render the decertification petition invalid even without the change in the number of eligible employees. In that case, there was an ongoing unfair labor practice when the decertification petition was signed in late November 1991 (i.e., Williams and Johnson had been unjustly terminated and their reinstatement was required). An ongoing unfair labor practice of that magnitude could cast sufficient doubt on decertification petition so as to make it invalid. See NLRB v. Williams Enters., Inc., 50 F.3d 1280, 1288 (4th Cir. 1995) (company may not avoid duty to bargain with union unless it can demonstrate that its unfair labor practices did not cause the union's loss of support); Columbia Portland Cement Co. v. NLRB, 979 F.2d 460, 462-65 (6th Cir. 1992) (employer's failure to reinstate has long lasting effect on validity of decertification petition). In contrast, Beltway's technical violation of failing to reinstate Randall could not reasonably have led to any employee disaffection from the Union especially considering: (1) the lack of any evidence in the record that the regular run Randall began driving for Beltway in September 1991 was materially different from the regular run he was driving before the August 1991 strike, and (2) the testimony of the thirteen decertification petition signatories.

17

between Beltway, and Williams and Johnson regarding the reason Williams and Johnson did not receive runs to drive following the August 1991 strike. The Board may then consider what effect, if any, its resolution of this dispute has on the reinstatement and back pay issues for Williams and Johnson, and the validity of the decertification petition.

<u>PETITION GRANTED IN PART, VACATED IN PART, AND REMANDED</u>

18