NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTHERN BLEACHERY & PRINT
WORKS, Inc., Respondent.

No. 7654.

United States Court of Appeals
Fourth Circuit.

Argued June 11, 1958.

Decided July 29, 1958.

Fannie M. Boyls, Attorney, National Labor Relations Board, Washington, D. C. (Jerome D. Fenton, General Counsel, Thomas J. McDermott, Associate General Counsel; Marcel Mallet-Prevost, Asst. General Counsel, and Robert E. Manuel, Attorney, National Labor Relations Board, Washington, D. C., on brief), for petitioner.

Frank A. Constangy, Atlanta, Ga. (M. A. Prowell, Mildred McClelland, and Fred W. Elarbee, Jr., Atlanta, Ga., on brief), for respondent.

Warren Woods, Washington, D. C., for Machine Printers Beneficial Ass'n, Charging Party and amicus curiae.

Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and BARKSDALE, District Judge.

SOPER, Circuit Judge.

This petition for enforcement of an order of the Labor Board turns on the Board's determination that certain machine printers of the Southern Bleachery and Print Works, Inc. were not supervisors but employees of the company. The specific charges against the company are that it violated § 8(a) (1) (5) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (1) (5), by refusing to bargain with the Machine Printers Beneficial Association which had been certified as the bargaining representative of the machine printers, and also that the company violated § 8(a) (1) (3) and (4) of the statute by discharging certain machine printers for giving testimony against the company in the representation case.

On March 21, 1955, the union petitioned the Board for an election in a unit of workers designated generally as machine printers, including journeymen

and apprentices. The company contended in opposition that the machine printers had been made supervisors on June 5, 1950, and the Board sustained the contention and dismissed the petition. Thereafter the Board, upon the union's petition, reconsidered its action and after oral argument reversed its prior decision, one member dissenting, and ordered an election, which was held April 10, 1956, and resulted in a majority of 32-to-13 in favor of the union. Thereafter the Board certified the union as the bargaining representative of the employees and the union requested the company to bargain with it in regard to wages, hours and conditions of employment; but the company refused to bargain on the ground that the machine printers are supervisors and thereupon the proceeding now before us was instituted.

Section 2(3) of the Act excludes from the definition of the term "employee," and therefore from the protection of the Act, "any individual employed as a supervisor." Section 2 (11) of the Act defines the term "supervisor" as:

" * * * any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

Each printing machine is run by a crew of four men including a machine printer who stands in front of the machine and is primarily responsible for the production and quality of the printed cloth and exercises some authority over his less skilled helpers. They include a back tender who stands behind the machine, a grey tender who stands at the side and a can boy for every two machines. The issue of fact is whether each machine printer is a supervisor of the three helpers in his unit, or merely a lead man of greater skill and authority than his helpers but without supervisory authority as defined in the statute.

There were approximately forty machine printers, of whom thirty worked in three shifts in the print works, and ten who worked in two shifts in the shirting print in the bleachery of the company. In addition to the printers, whose status as supervisors is in dispute, there are eleven supervisors, including an overseer, three assistant overseers, five section foremen and two floormen in the print room; and six supervisors in the shirting print, including a shirting supervisor, two assistant overseers and three floormen. The total complement of the print room is one hundred sixteen, of which eleven are admittedly supervisors and thirty more are asserted by the employer to be supervisors. The total complement of the shirting print is forty-six, of which six are admitted to be supervisors and ten others are asserted to be such by the employer.

It is conceded that until June 1950, the machine printers were not supervisors. Prior thereto, in 1943, 1948 and 1949, elections had been held in a unit of machine printers but no bargaining representative had been selected in any of these elections. In June 1950, the employer changed the job designation of machine printer to that of unit supervisor and gave the printers a list of ten instructions entitled "Basic Responsibility of Unit Supervisor". These related to the responsibility of the printer as to the delivery of maximum production with satisfactory quality, correct printing of the cloth, decisions as to material requirements and mechanical replacements of the unit and instructions tending more clearly to show a supervisory status within the terms of the Act, including the responsibility to check on the time cards of the workers in his unit, to recommend their hiring and firing and rate increases, and to take necessary steps to report, reprimand or recommend disciplinary actions or infraction of company rules. In addition, the employer changed the method of computing the printers' pay

by increasing their weekly base pay by $25.00 in lieu of a lower base pay and production bonus. They continued to receive a guaranteed base pay plus time and one-half for time over 40 hours a week, an arrangement not applicable to admitted supervisors on straight salary.

The crucial question for decision is whether the status of the machine printer was actually changed to such an extent on June 5, 1950, that he was transformed from a skilled worker, charged of necessity with a measure of control over his helpers on the unit, to a unit supervisor clothed with the characteristic authority described in the Act as not merely of routine or clerical nature, but requiring the use of independent judgment. The Board found this to be a nice question, as appears from its change from its earlier decision in favor of the employer's contention to a contrary decision after further examination of the evidence. Before June 5, 1950, as well as after, the operation of a machine required the constant attention and much the greater part of the time of the head of the unit. He was obliged to check the quality of the cloth printed on his machine and to exercise the customary control of an experienced workman over his less skillful helpers. Since June 5, 1950, the printers have had the additional duty of initialing pay increase slips, time cards and material requisition slips, a function formerly performed by the overseers or assistant overseers. Testimony was given by certain unit supervisors at the hearing that since the institution of the new system in 1950 they had recommended pay increases for members of their crew which were honored by the management, and there was additional testimony that no pay increase was given to a member of any crew without the unit supervisor's approval. Similar testimony was given in regard to the filling of vacancies and in regard to the removal of an unsatisfactory employee. The evidence also showed that the pay of the helpers on the machines was computed upon time cards initialed by the machine printers

and that requisitions for supplies were also initialed by them.

On the other hand, there was testimony tending to show that the additional duties imposed upon the machine printers on June 5, 1950, with respect to the initialing of increased pay slips, time cards, etc., were for the most part routine matters, especially as increases in pay, although not completely automatic, were usually allowed after a set period of time on the job. There was also testimony by five of the machine printers that although they had initially recommended that employees be hired, fired, given merit increases, promoted or demoted since 1950, the slips were signed by them routinely without the exercise of independent judgment and in some instances without examination or inquiry on their part, and that replacements were sometimes made without consultation with them.

The first decision of the Board in favor of the employer upon this conflicting testimony was issued July 26, 1955. Thereafter the union petitioned the Board to reconsider its decision; and on August 19, 1955, while the petition was pending, the company discharged the five printers who had testified against it in the representation proceeding, alleging that the two print rooms have been combined and that the company was not satisfied with the way that the printers had carried out their duties as unit supervisors. After the rehearing was granted and oral argument was heard, the Board re-examined the testimony and rejected the employer's contention, and expressed its final conclusion in the following words:

"On the basis of the above facts and the entire record, we are satisfied that the purported 1950 change in the status of the machine printers did not, in fact or in law, convert the machine printers to supervisors or deprive them of their employee status. The principal effect of the instructions given to the machine printers was to codify the control previously exercised by them over the less experienced grey tenders,

back tenders and can boys, a control, as we have indicated, that is customarily exercised by any skilled craftsmen over their helpers and apprentices. To the extent that the 1950 instructions attempted to delegate to the machine printers power or authority beyond that of a craftsman, the absence, for all practical purposes, of the exercise of such authority negatives its existence. We find, therefore, that the machine printers are employees within the meaning of the Act."

■■■■ This final decision must be accepted by us since there is evidence to support it, and the findings of the Board with respect to questions of fact are conclusive under § 10 of the statute if they are supported by substantial evidence on the record as a whole. Our attention is called to certain decisions of the courts which point out that the definition of the term "supervisor" in the Act is phrased in the disjunctive so that an employee who has authority in the interest of the employer to perform any of the enumerated acts in the exercise of independent judgment acquires the status of a supervisor and, also, that the question of status is determined by the existence of the power rather than the frequency of its exercise. It is equally clear, however, that the employer cannot make a supervisor out of a rank and file employee simply by giving him the title and theoretical power to perform one or more of the enumerated supervisory functions. The important thing is the possession and exercise of actual supervisory duties and authority and not the formal title. It is a question of fact in every case as to whether the individual is merely a superior workman or lead man who exercises the control of a skilled worker over less capable employees, or is a supervisor who shares the power of management. In this case we have the unquestioned fact that after 1950, as before, the machine printers did the actual work of operating the machines and directing the activities of their helpers and, also, that during both periods a number of super-

visors, assistant supervisors and foremen exercised authority over the printers. If the Board, taking these facts in consideration, accepted the testimony of witnesses for the Board that the new authorities given to the printers on June 5, 1950, were largely of a routine or perfunctory nature, it cannot be said that the finding was unwarranted by the evidence or without support in the decisions of the court. See Ohio Power Co. v. N.L.R.B., 6 Cir., 176 F.2d 385, 11 A.L.R.2d 243; N.L.R.B. v. Leland-Gifford Co., 1 Cir., 220 F.2d 620; N.L.R.B. v. Quincy Steel Casting Co., 1 Cir., 200 F.2d 293; Precision Fabricators v. N.L.R.B., 2 Cir., 204 F.2d 567; N.L.R.B. v. North Carolina Granite Corp., 4 Cir., 201 F.2d 469; N.L.R.B. v. Swift & Co., 9 Cir., 240 F.2d 65.

■■■■ In its final decision the Board held that the company was guilty of unfair labor practices in two particulars, (1) in refusing to bargain with the union and (2) in discharging five machine printers on August 19, 1955, because they had testified in favor of the union and against the company at the representation hearing which was held on May 5 and 6, 1955. As to the first matter there is no dispute. It is admitted that the company refused to bargain with the union. Indeed, this was the only way that the company could test the decision of the Board, classifying the printers as ordinary employees rather than supervisors.

With respect to the second matter, the trial examiner held a hearing and made the finding on May 5, 1956, which the Board approved on June 24, 1957, that the five printers were discharged because of their testimony. There was substantial evidence to support this finding. In the latter part of April 1955, after receiving notice that the Board would hold the representation hearing on May 5, 1955, the superintendent of the print works addressed all the printers on three shifts. His speech was in manuscript and carefully prepared. He informed the printers that the hearing would be held and warned them that if any of

them had been participating in union efforts to destroy the system set up by the company, or was opposed to the company's policy, he would be regarded as hostile to the company. A similar speech was delivered to the printers by the superintendent of the bleachery. Notwithstanding these warnings, the five printers subsequently discharged answered the subpoena of the Board and testified at the representation hearing, contrary to the company's contention, that they had not exercised any genuine supervisory authority in the performance of their duties.

Thereafter, on July 26, 1955, as we have seen, the Board rendered a decision as to the supervisory status of the printers in favor of the company. About a week later, in August 1955, the company notified the printers of the Board's decision and advised those who disagreed to seek employment elsewhere. A few days later the union petitioned for a rehearing and thereafter, on August 19, the company discharged the five men, telling them the two print rooms were to be combined and that the company was not satisfied with the way in which they had carried out their duties as unit supervisors. The decision to discharge the five men was taken at a conference of the top officials of the company with their attorney but without consultation with the immediate supervisors of the men. Under these circumstances it was not unreasonable for the Board to infer that the men were discharged on account of their testimony and the inference is further supported by the evidence which shows that the work of the men as operators of the printing machines was well performed and was satisfactory to their supervisors in the printing rooms.

The explanation and defense of the company is that it discharged the men in connection with operational changes in the business in August 1955, consisting of the consolidation of the print rooms and the elimination of certain supervisory employees, and that the five men selected for discharge were let go because they were not satisfactorily performing their duties as supervisors. It is contended that the Board's decision fails to recognize the established legal principle that insubordination is an adequate cause for discharge and that the Board may not substitute its own ideas of discipline in management for those of the employer. See Martel Mills Corporation v. N.L.R.B., 4 Cir., 114 F.2d 624, 633; Local No. 3, etc. v. N.L.R.B., 8 Cir., 210 F.2d 325, 329; N.L.R.B. v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260, 267.

We do not think that we would be justified in rejecting the findings and conclusions of the Board on this point. The action of the five men was without a doubt offensive and may have seemed insubordinate to the company; but the Board may well have thought that the company's defense was specious since the evidence showed that the printers operated their machines in a satisfactory manner and were not discharged until after they had given testimony in favor of the union. The evidence does indicate that some changes of personnel were made in the print rooms at or about the time the men were discharged, but it fails to demonstrate convincingly either that a substantial reduction in personnel was required or that the selection of the five men for discharge from the list of printers had no relation to their hostile testimony. In short, it cannot be said that the Board was completely wrong in holding that the men were discharged because they supported the union.

We find no prejudicial error in the rulings of the examiner and the Board on the questions of evidence and no ground for the remand of the case by this court to the Board to take additional testimony. The question was first raised on March 19, 1956, by a petition of the company in which it asked the Board to vacate its second decision of March 13, 1956, denying supervisory status to the machine printers, and to reopen the record for the taking of additional testimony. It was raised a second time at the examiner's hearing on September 18 and 19, 1956, at which the charges of unfair labor practice on the part of the company

were considered and certain testimony offered by the company was rejected. Finally, the question was raised in a petition to this court, filed shortly before the argument of the appeal, in which the company asked the court to remand the case to the Board under 29 U.S.C. § 160 (e) with direction to permit the company to adduce additional evidence in support of its defense to the unfair labor practice charges.

The nature of the proffered testimony is shown in the last mentioned petition. It comprises an offer to show that in August 1955, subsequent to the first decision of the Board on July 26, 1955, the company consolidated its print rooms, abolished the position of section foremen and transferred the supervisory duties to the unit supervisors in addition to the authority which they previously possessed; and that thereafter the unit supervisors exercised independent judgment on many occasions in the exercise of their supervisory responsibilities, and that the discharged men unsuccessfully carried out the responsibilities assigned to them.

■■ Offers of testimony along these lines were rejected by the Board and later by the examiner on the general ground that they constituted an attempt to reopen the decision of the Board in regard to the supervisory status of the printers without showing that the evidence was not available when the question was pending before the Board and before its final decision was made. The changes in the print rooms were made in August 1955, shortly after the Board granted the rehearing on the supervisory question at the request of the union and before the rehearing took place. The testimony was therefore available to the company at that time but it made no request for an opportunity to show that substantial changes had been made of the status of the printers which would support and strengthen the position which the Board had previously made. Under these circumstances there was no abuse of the sound discretion vested in the Board to refuse to reopen the case. It is generally held that one who desires a new trial in order to adduce new evidence must show reasonable diligence to produce the facts at the original trial and also that the new evidence is not merely cumulative to that which was then produced. Blytheville Cotton Oil Co. v. Kurn, 6 Cir., 155 F.2d 467, 470; Chemical Delinting Co. v. Jackson, 5 Cir., 193 F.2d 123, 127. Furthermore, it must be borne in mind that the company's view as to what constitutes supervisory status differs from that of the Board and that the offer of the company did not specify with clearness how the additional testimony differed in its character from that already considered. The Board had no reason to believe at the time that the petition for remand was made that the duties of the printers in August differed materially from those which it had previously found to be lacking in a bona fide supervisory character.

■ For these reasons there was no error on the part of the examiner in rejecting the same testimony at the unfair labor practice hearing. He was justified in concluding that the offer was primarily an effort to reopen a question which had been decided by the Board at the representation hearing. He had the additional ground that the proffered testimony related to the question of supervisory status rather than to the charge that the printers had been discharged for their union affiliation.

The petition to remand the case to the Board for the taking of additional testimony is denied. A decree enforcing the decision and order of the Board will be entered.