**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GLENMARK ASSOCIATES,
INCORPORATED, d/b/a Cedar Ridge
Nursing and Rehabilitation Center,
<u>Petitioner,</u>

v.                                                                                          No. 97-1403

NATIONAL LABOR RELATIONS BOARD,
<u>Respondent.</u>

GLENMARK ASSOCIATES,
INCORPORATED, d/b/a Carehaven of
Point Pleasant,
<u>Petitioner,</u>

v.                                                                                          No. 97-1404

NATIONAL LABOR RELATIONS BOARD,
<u>Respondent.</u>

NATIONAL LABOR RELATIONS BOARD,
<u>Petitioner,</u>

v.                                                                                          No. 97-1514

GLENMARK ASSOCIATES,
INCORPORATED, d/b/a Cedar Ridge
Nursing and Rehabilitation Center,
<u>Respondent.</u>

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

No. 97-1515

GLENMARK ASSOCIATES,
INCORPORATED, d/b/a Carehaven of
Point Pleasant,
Respondent.

On Petitions for Review and Cross-applications
for Enforcement of Orders of the
National Labor Relations Board.
(9-CA-34081, 9-CA-34204)

Argued: December 3, 1997

Decided: June 19, 1998

Before NIEMEYER and WILLIAMS, Circuit Judges, and JONES,
United States District Judge for the Western District of Virginia,
sitting by designation.

_____

Petitions for review granted and cross-applications for enforcement
denied by published opinion. Judge Williams wrote the majority opin-
ion, in which Judge Niemeyer concurred. Judge Jones wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** Glenn Patrick Hare, STEPTOE & JOHNSON, Martins-
burg, West Virginia, for Glenmark. Susan M. Pavsner, NATIONAL
LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON
BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Asso-
ciate General Counsel, Aileen A. Armstrong, Deputy Associate Gen-

2

eral Counsel, Charles Donnelly, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

_____

**OPINION**

WILLIAMS, Circuit Judge:

This case requires us to decide whether nurses employed in nursing homes who have significant management responsibility in the facilities during the evening shifts and on weekends and who also have meaningful roles in the assignment and discipline of certified nursing assistants (CNAs) meet the statutory definition of supervisor under § 2(11) of the National Labor Relations Act (the NLRA or the Act). See 29 U.S.C.A. § 152(11) (West 1973). We join the Sixth Circuit[1] in finding untenable the National Labor Relations Board's (NLRB or the Board) conclusion that these nurses, who are the senior staff members and patient care coordinators for more than two-thirds of the week, do not exercise independent judgment in the performance of their duties. Therefore, we grant Glenmark Associates, Inc.'s (Glenmark) petitions for review and deny the NLRB's cross-petitions for enforcement.

I.

This case arises on Glenmark's consolidated petitions for review of two NLRB Decisions and Orders in which the Board determined that Glenmark had committed unfair labor practices at two of its West Virginia nursing homes, Cedar Ridge Nursing and Rehabilitation Center (Cedar Ridge) and Carehaven of Point Pleasant (Point Pleasant), by refusing to deal with the newly organized nursing unions at

_____

[1] See **Caremore, Inc. v. NLRB**, 129 F.3d 365 (6th Cir. 1997) (determining that nursing home Licensed Practical Nurses (LPNs) met the definition of supervisor under § 2(11) of the NLRA). But see Beverly Enters. --Penn., Inc. v. NLRB, 129 F.3d 1269 (D.C. Cir. 1997) (enforcing the NLRB's order determining that LPNs were not supervisors); Providence Alaska Med. Ctr. v. NLRB, 121 F.3d 548 (9th Cir. 1997) (2-1 decision) (holding that charge nurses were not statutory supervisors).

3

those facilities in violation of § 8(a)(1) and (a)(5) of the Act. See 29 U.S.C.A. § 158(a)(1), (a)(5) (West 1973). Glenmark does not deny its refusal to bargain with the unions. It, however, contends that the refusal was justified, and therefore not an unfair labor practice, because the Cedar Ridge and Point Pleasant bargaining units were illegally organized. Glenmark claims that both bargaining units contain nurses who meet the definition of "supervisor" under NLRA § 2(11), see 29 U.S.C.A. § 152(11) (West 1973), and therefore are prohibited from unionizing. The nurses at issue at the Cedar Ridge and Point Pleasant facilities are somewhat differently situated. Therefore, we will discuss separately the factual backgrounds leading to the present dispute.

A. Cedar Ridge

Cedar Ridge is a 120-bed nursing home located in Sissonville, West Virginia. The nursing staff consists of: one Director of Nursing, one Assistant Director of Nursing, three full-time Registered Nurses (RNs), one part-time RN, twenty-two Licensed Practical Nurses (LPNs), and between fifty-eight and sixty CNAs. Because Cedar Ridge provides twenty-four hour care to its patients, its staff works on a three shift schedule, i.e., each twenty-four hour day is divided into three eight-hour shifts. The Director of Nursing and the Assistant Director of Nursing generally work only during the day shift on Monday through Friday. The RNs operate on a separate twelve-hour shift schedule. RNs sometimes work weekend hours and participate in an on-call rotation system. RNs serve as charge nurses when they are on the floor. When there is no RN coverage, however, the senior LPN on the shift takes over the charge nurse's responsibilities.[2] Any LPN employed at Cedar Ridge could potentially serve as the charge nurse for a particular shift.

Cedar Ridge is divided into two wings. Each wing contains sixty beds and is divided into two halls known as the "long hall" and the

_____

[2] The LPN charge nurse's job description states: "The LPN charge nurse, acting under the direction of the RN Director of Nurses, plans, organizes, directs, and supervises the activities of all employees assigned to his/her tour of duty. This may be a unit, or may be the entire facility on holidays, weekends, evenings or nights." (J.A. at 236.)

4

"short hall." Each long hall contains thirty-five beds, whereas each short hall contains twenty-five beds. Of the two short halls, one is reserved for patients requiring a higher degree of nursing care. The LPNs and CNAs on staff are each assigned to one of the four halls.

LPNs' duties primarily relate to direct patient care including: dispensing medication, performing supplemental feedings, assisting regular feedings, checking room conditions, ensuring that residents are clean, dry, and regularly turned, charting vital signs, noting residents' intake and output, and reporting patient conditions at the end of the shift. LPN duties, however, also include managing CNAs in certain circumstances. If a staff shortfall occurs for any reason, floor or charge LPNs reassign CNAs to ensure adequate patient care. Additionally, if a CNA assigned to a particular shift does not report to work, the LPN charge nurse calls off-duty CNAs to attain an adequate staff level at the facility. If a CNA makes a special scheduling request during a shift, the LPN floor nurse has the authority to approve or disapprove the request. LPNs are also involved in the discipline of aides. If a CNA does not perform his job in accordance with facility procedures, an LPN can take one of several steps. For a minor infraction, the LPN may counsel the CNA on the proper procedure, may file a written "verbal correction notice" with the Director of Nursing, or take both actions. For serious infractions, the LPN witnessing the behavior may immediately suspend the CNA. The duties of CNAs at Cedar Ridge involve more basic, personal hygiene-oriented duties than do the LPNs' responsibilities. For example, CNAs turn, bathe, dress, provide ice for, brush the teeth of, and change the linens and clothing for patients.

On May 1, 1995, District 1199, The Health Care and Social Services Union, SEIU, AFL-CIO (the Union) filed a petition in the NLRB's regional office requesting that an election be held so that the Union could be certified as the exclusive bargaining representative for the twenty-two LPNs at Cedar Ridge. On June 14, 1995, the NLRB's Regional Director[3] for Region 9 determined that the unit comprised

_____

[3] At the time of the Decision and Direction of Election for Cedar Ridge, the NLRB had in place an Acting Regional Director. By the time the Decision and Direction of Election for Point Pleasant was issued a Regional Director had been appointed. For convenience, we will refer to each as "the Director."

5

of "[a]ll full-time and regular part-time licensed practical nurses (LPNs) employed by [Glenmark] at its Sissonville, West Virginia facility, excluding all professional employees, guards, and supervisors as defined in the act" was appropriate. (J.A. at 510.) Thus, the Director ordered an election to determine whether the LPNs in the unit were interested in union representation. Twenty-one LPNs voted in the election. Eleven LPNs voted in favor of union representation and ten voted against it. A simple majority having been attained in the representation vote, the Director certified the Union as the exclusive collective bargaining representative of the Cedar Ridge LPNs.

B. Point Pleasant

Point Pleasant is a 68-bed facility in Point Pleasant, West Virginia. The nursing staff consists of: one Director of Nursing, one Administrative Nurse/MDS Coordinator, two RNs, ten LPNs, and between thirty-one and forty CNAs. Point Pleasant also provides twenty-four hour care to its patients. The staff works on a three shift schedule; each twenty-four hour day is divided into three eight and one-half hour shifts. The Director of Nursing and the Administrative Nurse/MDS Coordinator generally work traditional forty hour schedules during the day shift on Monday through Friday. None of the administrative staff are on call or carry a beeper. The RNs and LPNs perform essentially identical tasks at Point Pleasant, with the exception of the Administrative Nurse/MDS Coordinator [4] who has additional responsibilities for scheduling staff and training CNAs.

At Point Pleasant, if one of the RNs is on duty she is automatically designated the charge nurse. On any shift with only LPNs, one is designated the charge nurse on the basis of seniority. [5] Any of the LPNs could be the senior LPN on a given shift and could be designated as the charge nurse. As part of their responsibilities, LPNs and RNs at Point Pleasant oversee the work of the CNAs. For example, they file an absence report when a CNA does not show up for work. In addition, the LPN or RN serving as charge nurse on a particular shift

_____

[4] Although an RN, the Administrative Nurse/MDS coordinator was not included in the Point Pleasant bargaining unit.
[5] The Cedar Ridge and Point Pleasant LPN charge nurse job descriptions are identical. See ante n.2.

6

assures that, whenever CNA staffing is deficient, adequate coverage is restored through a combination of calling in non-scheduled staff and reorganizing the coverage arrangement of the staff present at the facility. All LPNs and RNs have disciplinary responsibilities. When an RN or LPN sees that a CNA is not properly caring for a patient or has violated administrative policy,[6] she has several options. She may counsel the CNA on proper procedure, file a written "verbal correction notice," or both.

The terms and conditions of the Point Pleasant CNAs' employment are governed by a collective bargaining agreement. [7] That agreement dictates the procedures for: seniority, lay-off, promotion, hours of work, overtime, call-in work, overtime pay, holidays, personal days, bonus days, vacation, sick leave, bereavement leave, leave of absence, medical leave, military leave, jury duty, union leave, discipline and discharge, and grievances.

The disciplinary system mandated by the CNA agreement is a progressive one. When an infraction occurs, the first step in CNA discipline is verbal counseling which is documented by a written verbal correction report. The second step of the progressive discipline procedure is the issuance of a written warning. The third step is suspension without pay, and the final step is discharge. As noted earlier, RNs and LPNs complete the first step in the disciplinary process by filing written verbal correction reports.

On January 16, 1996, the Union sought certification as the exclusive bargaining representative of the LPNs and RNs at Point Pleasant. After a hearing, the Director determined that an election should be held in which the RNs and LPNs would have an opportunity to vote for union representation. In the election held on June 20, 1996, eleven nurses voted. Nine nurses voted for representation in a unit containing both RNs and LPNs. Shortly thereafter, the Director certified the bargaining unit as the exclusive collective bargaining representative of the Point Pleasant nurses.

_____

[6] For example, an administrative policy prohibits taking an unauthorized break.
[7] The Point Pleasant CNAs organized and became a part of the Union in 1992. Their unionization is not at issue in this appeal.

7

II.

After the Union was certified at each facility, it requested that Glenmark enter into negotiations. Glenmark, so that it could obtain judicial review of the certification, refused. The Union thereafter filed unfair labor practice charges. The NLRB's General Counsel brought unfair labor practice claims against Glenmark based on its refusal to bargain. The Board granted summary judgment against Glenmark because "[a]ll representation issues raised by [Glenmark] were or could have been litigated at the prior representation proceeding." (J.A. at 1127, 1131.)

Glenmark filed petitions seeking review of the Board's final orders determining that their refusal to bargain with the Union at its Cedar Ridge and Point Pleasant facilities was violative of § 8(a)(1) and (a)(5) of the Act. See 29 U.S.C.A. § 158(a)(1), (a)(5) (West 1973). The NLRB cross-petitioned for enforcement of its orders.

III.

The question of whether a specific employee is a supervisor is a particularly important one. While the Act protects the rights of certain employees to unionize, see 29 U.S.C.A. § 157 (West 1973), it does not extend those rights to employees who meet the definition of supervisor set out in § 2(11), see 29 U.S.C.A. § 152(3) (West 1973). Therefore, if the nurses at each facility meet the definition of supervisor, they must be excluded from bargaining units.

The Board applies an ad hoc, case-by-case analysis when deciding whether employees are supervisors as defined by § 2(11) of the NLRA. See American Fed'n of Television & Radio Artists, Cleveland Local v. Storer Broad., 745 F.2d 392, 399 (6th Cir. 1984) (reviewing case law discussing supervisory status and determining that there is no bright line rule governing whether a particular job is supervisory). The question of whether individuals are supervisors is a mixed question of fact and law. See NLRB v. Lauren Mfg. Co., 712 F.2d 245, 247 (6th Cir. 1983). As such, the Board's factual determinations regarding the supervisory status of the nurses in question should be overturned only if there is not substantial evidence in the record as a whole to support its finding. See NLRB v. St. Mary's Home, Inc., 690 F.2d

8

1062, 1067 (4th Cir. 1982). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). "As to the Board's application of the law to the facts, we must sustain the Board's determination if it is reasonable and consistent with the Act." NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262, 1269 (4th Cir. 1994).

If a review of the record, including all evidence presented to the Board, both in favor of the Board's position and opposed to the Board's position, reveals that the evidence in support of the Board's determination is deficient, we may deny enforcement of the Board's order. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Additionally, "courts must carefully scrutinize the Board's finding and the record on supervisory status." St. Mary's Home, Inc., 690 F.2d at 1067. As we said in St. Mary's Home:

> And this [thorough examination of the evidence] should be particularly true when the Board is determining supervisory status because of the inconsistency in the Board's application of the statutory definition and of the factors to be used in determining such application. So manifest has this inconsistency been that a commentator recently has aptly observed that "the Board has [so] inconsistently applied the [statutory] definition" of supervisor as to cause one necessarily to speculate "that the pattern [of Board decisions on supervisory status] displays an institutional or policy bias on the part of the Board's employees" as illustrated by a practice of adopting that "definition of supervisor that most widens the coverage of the Act, the definition that maximizes both the number of unfair labor practice findings it makes and the number of unions it certifies."

Id. (quoting Note, The NLRB and Supervisory Status: An Explanation of Inconsistent Results, 94 Harv. L. Rev. 1713, 1713-14, 1721 (1981) (all but first alteration in original)).

We turn now to the specific questions of whether the LPNs at Cedar Ridge and the LPNs and RNs at Point Pleasant meet the statutory definition of supervisor under the NLRA. Upon a thorough

9

examination of the record, we determine that there is not substantial evidence supporting the Board's conclusion that these nurses are not supervisors.

The NLRA defines the term "supervisor" as:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C.A. § 152(11) (West 1973). As the statutory language makes clear, an employee must meet three criteria to qualify as a supervisor. First, the employee must have the authority to perform at least one of the twelve enumerated duties. See Monongahela Power Co. v. NLRB, 657 F.2d 608, 612 (4th Cir. 1981) (stating that the employee need perform only one of the listed tasks to qualify as a supervisor). It is not necessary that the employee actually exercise the authority. See NLRB v. Southern Seating Co., 468 F.2d 1345, 1347 (4th Cir. 1972) (noting that the relevant inquiry is whether authority has been delegated not whether it has been exercised) (citing Turner's Express, Inc. v. NLRB, 456 F.2d 289, 292 (4th Cir. 1972)). Second, the employee's authority must promote the interest of the employer. See NLRB v. Health Care & Retirement Corp., 511 U.S. 571, 583 (1994) (holding that a nurse's patient care satisfies § 2(11)'s "in the interest of the employer" requirement). Finally, the employee's exercise of authority must require the use of independent judgment. The statutory language distinguishes independent judgment from actions that are merely routine or clerical. See 29 U.S.C.A. § 152(11) (West 1973). Both parties agree that the issue of whether the nurses at Cedar Ridge and Point Pleasant satisfy the third factor is at the heart of this controversy. As a result we must determine whether the nurses in question exercise independent judgment or merely perform routine or clerical duties.

10

A. Independent Judgment

The Board's interpretation of the independent judgment require-
ment is central to the present dispute. The NLRB concludes that the
nurses at Cedar Ridge and Point Pleasant are not supervising the
CNAs within the meaning of NLRA § 2(11), but are rather just inci-
dentally directing the work of less skilled employees.[8] The Board

_____

[8] This issue of the supervisory status of nurses serves as another exam-
ple of the NLRB's continuing effort to modify the plain language of
§ 2(11). In the late 1980s and early 1990s, the Board decided that the
unionization of LPNs and RNs should not be hindered by their potential
supervisory status. As a result of that policy determination, the Board
began utilizing an interesting interpretation of the requirement that the
supervisor's actions must be taken in the interest of his employer. See 29
U.S.C.A. § 152(11) (West 1973). Specifically, the Board determined that
nurses were not acting in the interest of their employers because the
supervisory actions nurses undertook were in the interest of patients.
This application of Board policy split the circuits. Compare Health Care
& Retirement Corp. v. NLRB, 987 F.2d 1256 (6th Cir. 1993) (declining
to enforce the Board's order because it was neither rational nor consis-
tent with circuit precedent or the NLRA), with Waverly-Cedar Falls
Health Care Ctr., Inc. v. NLRB, 933 F.2d 626 (8th Cir. 1991) (determin-
ing that there was substantial evidence to support the Board).

The Supreme Court intervened to resolve the dispute in the lower
courts and determined that the NLRB's interpretation of the act -- that
supervisory actions promoting patient care in the health care industry
were not for the benefit of the employer -- was not rational and consis-
tent with the NLRA. See NLRB v. Health Care & Retirement Corp., 511
U.S. 571, 576 (1994). The Court concluded that the Board "has chosen
. . . to rely on an industry-wide interpretation of the phrase `in the interest
of the employer' that contravenes precedents of this Court and has no
relation to the ordinary meaning of the language." Id. at 583.

After the Supreme Court's ruling, the NLRB corrected its interpreta-
tion of "in the interest of the employer," and it began this latest litigation
--attacking the supervisory status of nurses on the ground that nurses do
not exercise independent judgment, but rather just provide routine guid-
ance to less skilled employees. See Caremore, Inc. v. NLRB, 129 F.3d
365 (6th Cir. 1997); Beverly Enters.--Penn., Inc. v. NLRB, 129 F.3d
1269 (D.C. Cir. 1997); Providence Alaska Med. Ctr. v. NLRB, 121 F.3d
548 (9th Cir. 1997).

We are not the first court to wonder whether this new interpretation is
an end run around an unfavorable Supreme Court decision in order to

11

explains the distinction it is drawing in the following terms: "[S]killed workers cannot be regarded as supervisors simply because they make decisions about their work that might also define what needs to be done by their assistants." (Respondent's Br. at 25.) Based on the facts presented to it, the Board determined that the nurses in question do not meet the statutory definition of supervisors because they are

_____

promote policies of broadening the coverage of the Act, maximizing the number of unions certified, and increasing the number of unfair labor practice findings it makes rather than explicate a well-reasoned interpretation of the NLRA. See Caremore, Inc., 129 F.3d at 371 ("The NLRB's position generally has been that supervisory status is almost never to be accorded nurses whose supervisory authority is exercised over less-skilled professionals in the interest of patient care . . . . the NLRB continues to misapprehend both the law and its own place in the legal system . . . ."); St. Mary's Home, Inc., 690 F.2d at 1067 (noting that the Board had been criticized for its policy bias).

Credibility is as important to an agency appearing before us as it is to any other litigant. In this regard, we note that this Court has been sharply critical of supervisory status determinations, see St. Mary's Home, Inc., 690 F.2d at 1067, and that we have recently criticized the Board's questionable positions in several other areas, see Case Farms of North Carolina, Inc. v. NLRB, 128 F.3d 841, 850 (4th Cir. 1997) (Williams, J. concurring) (expressing "concern with the Board's apparent disregard for the decisions of the Circuit Courts"), cert. denied, 118 S. Ct. 1522 (1998); Be-Lo Stores v. NLRB, 126 F.3d 268, 273 (4th Cir. 1997) (holding that the Board did not properly analyze Gissel in reaching a determination that mandatory bargaining was an appropriate remedy); NLRB v. D&D Enters., Inc., 125 F.3d 200, 206 (4th Cir. 1997) (declining to enforce an unfair labor practice order because the Board did not follow this Circuit's precedent); Performance Friction Corp. v. NLRB, 117 F.3d 763, 768 (4th Cir. 1997) (noting that the Board's order requiring an employer to rescind a disciplinary policy and rehire all workers terminated under that policy overstepped the Board's remedial authority), cert. denied, 66 U.S.L.W. 3755 & 66 U.S.L.W. 3757 (U.S., May 26, 1998)(No. 97-1340); Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 253-54 (4th Cir. 1997) (noting that the NLRB analyzed a case arising in the Fourth Circuit under its own law, rather than our Circuit precedents). This troubling pattern leads us to the conclusion that the Board should reconsider its single-minded pursuit of its policy goals without regard for the supervisory role of the Third Branch.

12

highly skilled employees who are merely sharing their knowledge and expertise with their lesser skilled co-workers.

Professionals are by definition highly skilled employees whose jobs require the use of independent judgment. Not all professionals, however, are supervisors. Professionals routinely use their skills and exercise independent judgment in the performance of their own responsibilities. In the case of nurses, they routinely make judgments regarding how appropriately to treat patients. Some of those professional judgments would require action by CNAs.[9] The Board concludes, however, that because the nurses at Cedar Ridge and Point Pleasant are highly skilled and routinely exercise independent judgment in the performance of their own duties, sometimes affecting the duties of a CNA in the process, supervisory status is precluded. The Board is incorrect. It fails to appreciate the distinction between using skill and professional judgment to perform a complex job and using related skills and judgment to manage others. Clearly there is "a distinction between authority arising from professional knowledge and authority encompassing front-line management prerogatives." NLRB v. Health Care & Retirement Corp., 511 U.S. 571, 583 (1994). On the facts of this case, however, the Board has not correctly drawn that distinction.

At the core of § 2(11) is the ability to exercise management prerogatives. See Northern Virginia Steel Corp. v. NLRB, 300 F.2d 168, 171 (4th Cir. 1962). The twelve statutorily enumerated tasks defining supervisory authority all represent management power over the future of an employee -- be it in her initial hiring, day-to-day direction, or eventual firing. See NLRB v. Southern Bleachery & Print Works, 257 F.2d 235, 239 (4th Cir. 1958) (stating that the essential inquiry is whether the employer shares the power of management). As we catalogue below, the record persuades us that these nurses have the independent authority to exercise their own judgment to discipline and assign CNAs. The nurses at Cedar Ridge and Point Pleasant make important supervisory decisions that have serious employment consequences for the CNAs in their charge. Thus, they share the power of

_____

[9] For example, if a nurse noted that a patient was developing bed sores, she would call a CNA to reposition the patient to remedy the patient's condition.

13

management in the manner contemplated by the plain language of § 2(11).

### B. Cedar Ridge

Glenmark asserts that the LPNs at Cedar Ridge are statutory supervisors because they utilize independent judgment in performing two of the Act's enumerated criteria: assignment and discipline. The Board, by summarily adopting the findings made by the Director, conceded that the LPNs were involved in the assignment and direction of CNA work because they transferred CNAs among wings to remedy staff imbalances caused by absenteeism. The Board found, however, that because LPNs were instructed to follow routine procedures in handling these situations the LPNs were not required to exercise independent judgment. Moreover, while acknowledging that LPNs may issue "verbal correction reports" to CNAs, the Board determined that "any final decision on appropriate discipline only occurs after a thorough review by admitted supervisors." (J.A. at 375.) According to the Board, the LPNs "simply did not have the independent authority to impose discipline on other employees." (J.A. at 375.)

### 1. Assignment

In its arguments before us, the Board conceded that the LPNs had the authority to call CNAs in to work and to change their hall assignments at Cedar Ridge if circumstances dictated. The Board does not argue that this work did not constitute "assignment," one of the twelve listed supervisory activities under NLRA § 2(11). See 29 U.S.C.A. § 152(11) (West 1973). The Board, however, asks us to accept that maintaining an appropriate staff level (and during that process evaluating whether particular patients on a floor may require additional medical attention) does not require the exercise of independent judgment. Moreover, the Board contends that any independent judgment that might be required of the LPNs during any shift could be provided by the RN on call.[10]

_____

[10] Whether independent judgment could be provided by the RNs on call is not the issue before us. Both RNs and LPNs could be supervisors because both could have appropriate authority. Section 2(11) requires

14

The Board's finding that LPNs exercised no independent judgment in carrying out their assignment duties is simply unsupported by the record. There is no evidence presented that LPNs called RNs for consultation about whether to call additional CNAs into work, allow CNAs to alter their hallway assignments, change CNA break schedules, or let CNAs go home early due to illness or family emergency. Rather, the record is replete with uncontradicted evidence that LPNs consistently made independent scheduling decisions like those outlined above throughout the course of their shifts. This power to authorize schedule changes and reassign workers rises above the mere incidental direction of assistants.

For two out of three shifts during the day, and all three shifts over the weekend, there is no higher authority than the charge nurse at Cedar Ridge.[11] The record testimony of the facility administrator confirms this:

> Q: [D]o the LPNs have any responsibilities if something should go awry on that shift when you're not there?
>
> A: When we leave the building and turn the building over to the charge or the LPNs, RNs in charge, they have total run of the building . . . .

_____

only that the employee have the power to perform one of the twelve enumerated functions. See Monongahela Power Co. v. NLRB, 657 F.2d 608, 612 (4th Cir. 1981); NLRB v. Southern Seating Co., 468 F.2d 1345, 1347 (4th Cir. 1972). The relevant inquiry is whether the LPNs had the "authority to exercise any one of the statutory powers requiring the use of independent judgment." NLRB v. St. Mary's Home, Inc., 690 F.2d 1062, 1065 (4th Cir. 1982). The LPNs' authority need not be exclusive.

[11] The Board did not discuss the Cedar Ridge LPNs' responsibilities as charge nurses when it evaluated their supervisory status. By failing to address the fact that LPNs acted as charge nurses, the Board ignored our Circuit's precedent in which we assessed a charge nurse's duties and determined that she met § 2(11)'s requirements. See St. Mary's Home, Inc., 690 F.2d at 1067. For a discussion of both the importance of the designation "charge nurse" and our precedent holding that charge nurses are supervisors under § 2(11) of the NLRA, see post section III.C.3.

15

(J.A. at 323 (Testimony of Rodney Hannah, Cedar Ridge Administrator).) Thus, the charge nurse, often the senior LPN scheduled for the shift, is "`the highest ranking employee' on the job site at the time to whom other employees must look for direction." St. Mary's Home, Inc., 690 F.2d at 1066.

We cannot fathom the Board's position that for more than two-thirds of the week at a nursing home providing twenty-four hour care, where patient conditions can change on a moment's notice, there is no one present at the facility exercising independent judgment regarding proper staff levels and patient assignments. The Administrator's testimony cited above confirms that the LPNs are left in total control of the nursing home during evening and weekend hours. Quite obviously many scheduling decisions made "routinely" by the LPNs at Cedar Ridge must require independent judgment. The Board mistakenly assumes that because there is an established procedure for handling a particular scheduling situation, nobody is required to think. In the Board's view, LPNs just mechanically follow established procedure. The record before us reveals the fallacy of the Board's logic. Although there is a general procedure in place regarding whom to call to work should an absence occur, on some occasions the LPNs, either the charge nurse or any floor nurse, exercise their independent judgment and decide to operate the nursing home or their floor short-handed. Record testimony demonstrates that LPNs on the floor have the authority to allow CNAs to leave Cedar Ridge early, and when that occurs they generally reassign the remaining CNAs to ensure adequate patient coverage. In other situations, where the charge nurse is confronted with a floor in which patients are sicker than usual, the charge nurse may make a decision to assign an additional CNA to that area.[12]

_____

[12] The record demonstrates this point:

> Q: [H]ow do you determine where a floater is needed?
>
> A: By the number of sick -- well, you know if you have an even amount of people and you have one extra, then you're going to put the extra one sometimes where the highest, heaviest workload is.
>
> Q: And, how do you know where the highest, heaviest workload is?
>
> A: The number of ill patients on that side.

(J.A. at 162 (Testimony of Robin Batten, LPN).)

16

The authority to assign workers constitutes the power "to put [the other employees] to work when and where needed." Monongahela Power Co. v. NLRB, 657 F.2d 608, 613 (4th Cir. 1981). Such decisions are, in our view, inseverable from the exercise of independent judgment, especially in the health care context where staffing decisions can have such an important impact on patient health and well-being. An emergency decision regarding the appropriate staff level to accommodate ill patients requires a fact-specific individualized analysis of not only the patient's condition and the appropriate care, but also of the special skills of particular staff members. The conclusion that the Cedar Ridge LPNs exercise the authority to assign CNAs utilizing their independent judgment is sufficient for us to find that the Cedar Ridge LPNs are supervisors under the act. See NLRB v. St. Mary's Home, Inc., 690 F.2d 1062, 1066 n.4 (4th Cir. 1982) (collecting additional cases in support of the proposition that finding that an employee meets one of the twelve listed criteria is enough to confer supervisory status).

2. Discipline

We next address the Board's finding that Cedar Ridge LPNs did not discipline CNAs in a manner contemplated by the Act. The Board determined that the LPNs' verbal counseling of CNAs on how to properly perform job duties was merely the instruction of less skilled workers. It found that the verbal correction reports filed by LPNs with the Director of Nursing were not independent exercises of disciplinary authority because the LPNs did not have the final word on what disciplinary action would be taken against the CNAs. The Director of Nursing, in testimony at the hearing before the Director, flatly contradicted the Board's conclusion that LPNs did not participate in disciplining CNAs.[13]

_____

[13] She stated:

> Q: Do [the LPNs] discipline employees?
>
> A: Yes, they do.
>
> Q: Do they discipline employees on their own authority or do they have to have approval from you before they can issue discipline?
>
> A: They don't have to have my approval. They discipline themselves on their own judgment.

(J.A. at 42 (Testimony of Cindy Hamon, Director of Nursing).)

17

The NLRA requires only that a supervisor have the ability "effectively to recommend" "discipline." 29 U.S.C.A. § 152(11) (West 1973). Thus, the "relevant consideration is effective recommendation or control rather than final authority." NLRB v. Yeshiva Univ., 444 U.S. 672, 683 n.17 (1980). "The [NLRA] does not preclude supervisory status simply because the recommendation is subject to a superior's investigation." ITT Lighting Fixtures v. NLRB, 712 F.2d 40, 45 (2d Cir. 1983). We conclude that the LPNs, the highest ranking employees at the facility for a large portion of its operating hours, and thus the only witnesses to CNA performance, by filing written verbal correction reports when CNAs did not properly perform their duties, effectively recommended discipline. An LPN could choose not to file the verbal correction report and instead only orally counsel the CNA on whatever problem he was experiencing. By filing a written report with the Director of Nursing, the LPN made an independent judgment to bring improper behavior and patient care to the attention of the administrator who would follow-up on the report. This report was not filed for the purpose of enhancing a CNA's skills. The Director of Nursing admitted that she relied upon the LPN reports to advise her of problems on the shifts when she was off duty. **14** The LPN's decision to file a written verbal correction report effectively recommended disciplinary action because filing the report, which stated that the CNA had either neglected his patient care duties or had violated one of Cedar Ridge's administrative rules, led to an investigation by the Director of Nursing. See ITT Lighting Fixtures, 712 F.2d at 45. Therefore the Board's assertion that the LPNs do not effectively recommend CNA discipline is erroneous and unsupported by the evidence on the record.

LPNs also had the authority immediately to suspend CNAs for seri-

_____

**14** As the testimony reveals:

> Q: Are there CNAs that without the input from the LPN, you would not be able to say anything about whether they're a good performer, or a poor performer?
>
> A: Yes, sir, I depend on their input for that, particularly on the off shifts.

(J.A. at 75 (Testimony of Cindy Hamon, Director of Nursing).)

18

ous breaches of patient care protocol. The Assistant Director of Nursing at Cedar Ridge confirmed that an LPN suspended a CNA for rough treatment of a resident. (J.A. at 196 (noting that a CNA had been "rough with a resident and held a resident's arms and bruised the resident").) The suspension took place on the 3:00 p.m. - 11:00 p.m. shift without prior consultation with any RN or administrative staff member. The decision to suspend the CNA required that the LPN assess the seriousness of the incident and determine that the CNA's immediate removal from the presence of patients was appropriate. The LPN took this non-routine action without consulting any other staff member. This example illustrates that the LPNs at Cedar Ridge had the authority to take serious disciplinary actions when exigent circumstances required that they do so. It further shows that the LPNs were authorized by their employer to take such actions without prior management approval or consultation. This suspension is another example of the exercise of independent judgment to discipline a CNA.

## C. Point Pleasant

Glenmark contends that the LPNs and RNs comprising the bargaining unit at Point Pleasant are statutory supervisors because, especially when acting in their charge nurse capacity, they have the authority to exercise independent judgment to assign and discipline CNAs.

### 1. Assignment

The Board, by summarily adopting the findings the Director made in his Decision and Direction of Election for Point Pleasant, decided that RNs' and LPNs' duties in scheduling CNAs, though assignment as contemplated by the Act, did not require the exercise of independent judgment because the order in which individuals were to be called in was governed by the CNAs' collective bargaining agreement and the CNAs had regular hall assignments. Though it is undisputed that permanent staffing levels are determined by the facility administrator and the Director of Nursing, the decision of whether to utilize the call-in procedure to fill an emergency staff shortage at the shift level rests with the charge nurse. Additionally, as the Director acknowledged, "if an emergency involving a resident arises" an RN or LPN may alter a CNA's break schedule to accommodate the emer-

19

gency. (J.A. at 1088.) As we discussed in Part III.B.1 in reference to Cedar Ridge, the decisions of whether to call in additional staff and whether to reorganize the schedule to accommodate patient emergencies require the exercise of independent judgment. [15]

2. Discipline

The Board also determined in the Point Pleasant context that the verbal correction reports issued by RNs and LPNs were not "discipline" or the effective recommendation thereof such that the RNs and LPNs who had the authority to issue them could be classified as supervisors under the Act. We find this conclusion even less tenable at Point Pleasant than it was at Cedar Ridge. At Point Pleasant a documented verbal warning is the first step in the collective bargaining agreement-mandated disciplinary process. An RN's or LPN's written notation of a CNA error becomes a part of the CNA's personnel file. The decision to file a written report, rather than to just orally counsel the CNA on how to correct his performance, is disciplinary action. Under the progressive discipline system in place at Point Pleasant, the written verbal correction report is step one of the process. After the LPN or RN files an initial report, the next infraction automatically becomes a more serious matter. If enough infractions accrue, the CNA is terminated. Uncontradicted testimony by Jill Bumgardner, Director of Nursing at Point Pleasant, illustrates this point:

> Q: Do [the RNs and LPNs] discipline . . . employees?
>
> A: Yes, they do.
>
> Q: Are they expected to issue discipline to employees?
>
> A: Yes, they are.
>
> Q: Do they have the discretion to decide whether or not the form of the discipline will be a quiet talking to or if it's

_____

[15] Jill Bumgardner, Point Pleasant's Nursing Director, testified that the nurses had the discretion to determine whether to replace an absent CNA during a shift.

20

something that's put in writing that goes into their personnel file?

A: Yes, they do have that discretion.

Q: Does the discipline that is issued by the nurses become part of the progressive discipline system used by the nursing home?

A: Yes, it does.

. . .

Q: Have you relied upon the discipline of any of the nurses to make a determination as to what level of discipline you will give to a nursing assistant?

A: Yes, that discipline would become part of the progressive disciplinary procedure.

(J.A. at 425-26.) Accordingly, the written report of the LPN or RN is more than the recommendation of discipline, as it was at Cedar Ridge. Because of the progressive disciplinary system mandated by the Point Pleasant CNA collective bargaining agreement, filing a written report is in itself a disciplinary action.

3. Charge Nurse

Additionally the Board determined that charge nurse duties of RNs and LPNs were not supervisory because the charge nurses, although they had the additional authority to file incident and accident reports, otherwise had little, if any, extra responsibility.

This finding is not supported by substantial evidence or this Circuit's precedent. See St. Mary's Home, Inc., 690 F.2d at 1065-66. In St. Mary's Home, we repeatedly emphasized the importance of the designation "charge nurse" at a nursing home that operated on a twenty-four hour schedule. We held that that designation was important because the charge nurse was the "highest ranking official present

21

at the home" during her shift. <u>Id.</u> at 1067. At Point Pleasant, the charge nurse's job description tells the charge nurse that she may be responsible for all staff in the entire facility."The . . . charge nurse . . . plans, organizes, directs and supervises the activities of all employees assigned to his/her tour of duty. This may be a unit, or may be the entire facility on holidays, weekends, evenings or nights." (J.A. at 1010.) As we said in <u>St Mary's Home, Inc.</u>, "charge nurse" brings with it the responsibility of handling day-to-day crises that might arise with staff or patients at the home. <u>See</u> 690 F.2d at 1067-68. The charge nurse is the employer's designated representative to whom the other employees will first turn in the case of any unusual happening or emergency. Being designated "charge nurse" is more significant than acquiring a mere title, it is acceding to full responsibility for the nursing home. "`[J]ob titles are meaningless; it is the authority vested in the employee, be it expressly or by implication, that is the controlling factor.'" <u>Id.</u> at 1066 (quoting <u>Mid-Continent Refrigerator Service Co.</u>, 228 N.L.R.B. 917, 920 (1977)). For those shifts when the Director of Nursing is absent from the facility, the charge nurse is the "`highest ranking employee' on the jobsite at the time to whom other employees must look for direction." <u>Id.</u> at 1066. Any one of the members of the Point Pleasant (or Cedar Ridge) bargaining unit could be designated "charge nurse" on any particular shift. It does not matter that a particular staff member might be designated charge nurse only infrequently. "[I]t is the power and not the frequency of its use which is dispositive." <u>Id.</u> at 1068. The Board's conclusion that the designation "charge nurse" merely confers the additional duty of filing incident and accident reports is not supported by substantial evidence. The charge nurses' duties at Point Pleasant include: excusing other employees early from work, effectively recommending disciplinary action, dealing with emergencies, and acceding to the status of "`highest ranking employee on the jobsite.'" <u>St. Mary's Home, Inc.</u>, 690 F.2d at 1066. These responsibilities are indistinguishable from those possessed by the charge nurse at St. Mary's Home, whom we held to be a supervisor under § 2(11) of the NLRA. <u>See id.</u> at 1066, 1069. Thus, the Board once again has declined to follow our Circuit's law.**16**

_____

**16 <u>See ante</u>** n.8.

IV.

In sum, the Board's interpretation of "independent judgment" is not consistent with the evidence in this case. Evidence supporting the Board's determination that the nurses at Cedar Ridge and Point Pleasant do not exercise management prerogatives when overseeing CNAs is simply absent from the record. Therefore, the Board lacked substantial evidence for its conclusion that the LPNs at Cedar Ridge, and the RNs and LPNs at Point Pleasant do not meet the definition of supervisor under § 2(11) of the NLRA. Because of that evidentiary deficiency the Board has not proffered a rational interpretation of the NLRA. Additionally, the Board's conclusion that the charge nurses at Point Pleasant and Cedar Ridge are not supervisors contradicts this Circuit's binding precedent, St. Mary's Home, Inc., 690 F.2d 1062. Thus, we grant Glenmark's petitions for review. The Board's cross-petitions for enforcement are hereby denied.

PETITIONS FOR REVIEW GRANTED,
CROSS-PETITIONS FOR ENFORCEMENT DENIED

JONES, District Judge, dissenting:

As the majority notes, section 2(3) of the National Labor Relations Act exempts supervisors from the definition of "employees" eligible to bargain collectively. 29 U.S.C.A. § 152(3) (West 1973). Section 2(11) defines a supervisor as:

> [a]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C.A. § 152(11) (West 1973) (emphasis added). Accordingly, to qualify as a "supervisor," an employee must satisfy three criterion: (1) the employee must actually have the authority to engage in at least one of the twelve delineated activities; (2) the authority must be

23

exercised in the interest of the employer; and (3) exercise of the authority must involve independent judgment and not be merely routine or clerical. Here, the focus of our inquiry is whether the exercise of authority by the licensed practical nurses employed by the appellant satisfies the third criterion. Because I believe it does not, I respectfully dissent.

Section 2(11) was drafted with the specific intent of differentiating between actual management and "straw bosses, lead men, and setmen, and other minor supervisory employees." NLRB v. Bell Aerospace Co., 416 U.S. 267, 280-81 (1974) (quoting Sen. Rep. No. 105, 89th Cong., 1st Sess. 4 (1947)). The Act also addresses the existence of "professional employees," that is, employees who "engage[ ]in work . . . involving the consistent exercise of discretion and judgment in its performance." 29 U.S.C.A. § 152(12) (West 1973). Specifically, the Act recognizes that despite the fact that such employees consistently exercise discretion and judgment in performing their work, they are nevertheless to be regarded as employees, not supervisors. Providence Alaska Medical Center v. NLRB, 121 F.3d 548, 554 (9th Cir. 1997).

Recognition by the Act's drafters of the need to address professional employees explicitly speaks to the difficulty frequently encountered in determining when such employees become supervisors. With little effort, one can identify numerous employees in a host of professional fields who regularly make decisions, many of them complex, involving the exercise of their professional judgment, and many of which effect the direction or control of other employees. In such complex circumstances, it is ultimately the degree of discretion exercised by the individual that controls whether they are an employee or a supervisor. See Beverly Enterprises-Pennsylvania, Inc. v. NLRB, 129 F.3d 1269, 1270 (D.C. Cir. 1997). Where an employee's discretion is substantially constrained by her superiors, exercise of that authority, even where complex decisions are involved, is "routine" and therefore does not constitute an exercise of "independent judgment" under the Act. Id. Determination of whether an employee's authority is substantially restrained requires that the Board engage in a close scrutiny of the particular facts and circumstances on a case-by-case basis. See American Fed'n of Television and Radio Artists, Cleveland Local v. Storer Broad, 745 F.2d 392, 399 (6th Cir. 1984).

24

Here, it is undisputed that an LPN's job affords the LPN discretionary authority over certified nursing assistants employed by Glenmark. However, the record makes clear that the LPNs' discretionary control of CNAs at both the Cedar Ridge and Point Pleasant facilities is substantially constrained. The decisions made by the LPNs regarding CNAs are limited to set options. The majority of CNAs are given permanent assignments by registered nurses. The remaining CNAs are assigned various work duties by daily work sheets posted by RNs at the beginning of each shift. When CNAs are absent, LPNs can fill the vacancy, but they are required to first request any volunteers, and then to fill the vacancy in accord with CNA seniority. LPNs are also authorized to permit a CNA to leave work early because of an illness or emergency, but the LPN is required to inform the supervising RN of the action. LPNs have no authority to schedule CNAs on a given day or week, nor do they decide whether or when a CNA will be laid off, or can take vacation.

The LPNs' disciplinary powers are similarly constrained. LPNs can remove a CNA from the presence of a resident only if they suspect the CNA of abusing the resident. An LPN can also instruct a CNA on how to perform a given task, or correct their performance of a task. However, LPNs are not formally involved in the evaluation process of CNAs and LPNs make no decisions regarding the promotion or discharge of CNAs. The LPNs' only formal disciplinary power consists of issuing a written "verbal correction notice," which is given to the RNs. The RNs then take whatever steps they deem appropriate, including taking no action. LPNs cannot discharge a CNA, nor can they compel action by an RN on the basis of a written correction notice.

The collective bargaining agreement in place at the Point Pleasant facility further restricts the discretionary authority of LPNs working at that facility. There, seniority governs the procedure for calling in part-time and off-duty full-time CNAs. If a CNA wishes to change shifts or jobs, the contractual bidding procedure dictates. CNA grievances are controlled by the agreement's grievance procedure which requires that first step grievances be presented to the nursing director, who is authorized to resolve the grievances. As at Cedar Ridge, LPNs can issue written "verbal correction notices," but they must be reviewed by the nursing director.

25

The record clearly reflects the Board's assessment of the LPNs' roles. As nurses, they make professional judgments regarding the care and treatment of their patients, which frequently require the actions of the CNAs. While the LPNs exercise judgment in making these decisions, it is exactly the type of judgment-making contemplated by section 2(12), not the "independent judgment" required by section 2(11).

The majority contends that the Board's decision is incorrect because it fails to recognize that while the LPNs undoubtedly exercise professional judgment in performing their own duties, they also exercise independent judgment in managing the CNAs. Assuming that such a dichotomy exists, the record makes clear that the LPNs' discretion with regard to the assignment, discipline and other statutory factors is extremely limited. As the D.C. Circuit noted in Beverly Enterprises, 129 F.3d at 1270, considering facts similar to those of the instant case, the LPNs' discretion "[b]asically . . . consists of assigning and monitoring the performance of discrete patient care tasks," and scheduling CNAs so as to minimize the disruption of that care. Id. This limited authority is so constrained as to render exercise of it routine and therefore devoid of the independent judgment specifically required by the Act.

Despite the limited nature of the LPNs' authority, Glenmark also advances the proposition, adopted by the majority, that the LPNs must be supervisors because they are often the senior personnel present at the facility, and are appointed as "charge nurses" at those times. Glenmark reasons that the LPNs must be supervisors, since otherwise there would be no one in charge at the facility a substantial portion of the time. Such an argument ignores the plain evidence in the record that although the LPNs are often the senior personnel on duty, there is always an on-call RN who remains ultimately responsible for each facility at all times. The essence of this distinction was well made by the Seventh Circuit in NLRB v. Res-Care, Inc., 705 F.2d 1461 (7th Cir. 1983), in which the court observed that "[a] night watchman is not a supervisor just because he is the only person on the premises at night, and if there were several watchmen it would not follow that at least one was a supervisor."

In sum, the record contains ample facts to sustain the Board's finding that the LPNs employed by Glenmark at their Point Pleasant and

26

Cedar Ridge facilities do not exercise "independent judgment" in controlling or otherwise directing the CNAs. Therefore, the Board's decision should be affirmed in accord with the well-established standard that its factual determination regarding the supervisory status of an employee should be overturned only if there is not substantial evidence in the record as a whole to support the finding. See NLRB v. St. Mary's Home, Inc., 690 F.2d 1062, 1067 (4th Cir. 1982).

For the foregoing reasons, I would deny the petition for review and grant the Board's cross-petition for enforcement.

27